68.     As the Class Members are identified and the identity of the MBS REMICs revealed through this action, the individual "Trusts"/ MBS REMICs will be turned over to the IRS for auditing.

69.     Upon information and belief, it is asserted that the IRS is aware that a list of alleged "unqualified" REMICs is forthcoming through the identity of the Class Members' mortgage loan "Trusts" in this action.

### Securitization and Standing:

70.     To the judges throughout the Commonwealth and to the homeowners, the foreclosing Plaintiff, a servicing company or "Trust" entity appears to be a bank or lender.   This falsity is due to its name in the style of the case.   They are not banks or lenders to the loan.   They are not a beneficiaries under the loan.   They do not possess a Mortgage in the property.   They will never have a right to posses a mortgage in the property.   It would have been a more honest representation for the foreclosing entity to called itself something like "Billy Bob's Bill Collectors,"

71.     In such cases, the "trustee" filing the foreclosure complaint is not known to the homeowner.   The very first time the homeowners learns that their home was put up as collateral for a publicly traded and sold home loan REMIC (a federally regulated Security) is at the time they are served with a foreclosure complaint.

72.     These "trusts" are actually Mortgage Backed Securities (MBS).   An MBS is an investment vehicle, defined and regulated as "Security" by the Security and Exchange Commission (SEC.)

73.     At the time the homeowners signed a Promissory Note and Mortgage, they were unknowingly converting their property into an asset of a MBS.   The

27

homeowners were never informed of the nature of the scheme.  They were deliberately induced into signing a Negotiable Instrument which was never intended as such, but was intended as collateral for a MBS.

74.     The fact that the loan was meant to fund a MBS was a "material disclosure" which was deliberately and intentionally undisclosed.  The failure to disclose the identity of the true lender at closing was also a "material disclosure;" the nature of which would make the contract voidable under Kentucky contract law.

75.     From the time of the Great Depression up and until 1999, the conversion of loans into MBS was illegal. The Banking Act of 1933 established the Federal Deposit Insurance Corporation (FDIC) in the United States and introduced banking reforms, some of which were designed to control speculation of the exact nature of what has taken place in the last several years.  It was commonly known as the Glass–Steagall Act.  Over the years provisions of the Act were eroded little by little, until the Act was finally killed with the last repeal of the section which prohibited  a bank holding company from owning other financial companies.   This was accomplished with the Gramm–Leach Act.

76.     The repeal of the Glass-Steagall Act of 1933 effectively removed the separation that previously existed between Wall Street investment banks and depository banks and has been blamed for creating the damage caused by the collapse of the subprime mortgage market that led to the Financial crisis of 2008–present day.  The repeal opened the door for an interpretation which would supposedly allow securitization of mortgage loans.  This interpretation has yet to be challenged, is ripe for such, but must be left for another day.

28

77.     Mostly beginning in 2004, hundreds of thousands of residential mortgages were bundled together (often in groups of 5,000 mortgages), and investors were offered the opportunity to buy shares of each bundle, an MBS.    Some of the bundles were offered as Bond Certificates, guaranteeing a rate of return.    Many of these Bond MBS were funded by large private and governmental pension funds and in some cases, as the case with Greece, by foreign governments

78.     Investments were made in the MBS, based on a prospectus, which had to be filed with the SEC.    The MBS would always be rated "AAA" by Moody's or Standard & Poors in order to invoke a sense of confidence for the investors.    The rating agencies were hired and compensated by the underwriter/salesman of the MBS.    The rating Agencies are currently under investigation by the Justice Department for their role in the financial meltdown.

79.     The prospectus was created, the MBS rated and the investors money was pledged and collected long before the homeowner ever even applied for a loan.

80.     In other words, the MBS was created first.    The loans fitting the description of those found in the prospectus had to then be created and originated.    Each MBS/Trust was required to keep a list of the individual loans they had allegedly recruited for the MBS.    This list has to be publicly recorded with the SEC.    However, the SEC did not require any proof that the loans actually existed or were possessed by the MBS.    For the tax man and in order to qualify as a REMIC, the Notes and mortgages listed with the SEC had to be held, and mortgages recorded ON THE DATE THE MBS CLOSED.

81.     Each such MBS bundle was given a name, such as "ABC Home Loan Trust 2006 ABC-8."    The name indicates information about the particular trust, such as

29

the year it was created and closed and its reference name and number for the SEC and IRS.

82.     As required by the SEC, each MBS/Trust has a Pooling and Servicing Agreement ("PSA") which must be publicly filed.   The only purpose for the PSA is for the administration and distribution of funds to the investors and the obligation of the so-called Trustee in administering the MBS.   The investors who put up the money for the MBS and who received the MBS Certificates or Bonds, are not parties to the PSA.

83.     The PSA merely sets forth what happens after the mortgages are bundled together.   However, the PSA also sets forth a Cut Off Date.   The Cut Off Date is the date on which all mortgage loans in the MBS/Trust must be identified and set out in the SEC required list of mortgage loans.   Often, these loans were identified and listed for the SEC and the investors, regardless of whether the loan existed or had been closed. Some loans were listed in SEC filings in multiple MBS.

84.     Like the Cut Off Date, each MBS/Trust had a Closing Date.   The Closing Date is the date that the individual identified mortgages were to be transferred through the Custodian for the benefit of the investors.   The Trust Custodian must certify that for each mortgage loan, the Trust Custodian has possession of the original Promissory Note, all original endorsements and assignments transferring the Note and proof that the ownership of the Note has been transferred for the benefit of the shareholder/investors.   Further proof of the ownership of a mortgage loan is required by a public recording of the Mortgage or Assignment of the Mortgage itself.   This MUST have occurred by the closing date.

85.     The Servicers worked to collect money for the MBS from the individual loans and collected and distributed escrow funds.   The "Trustees" were Custodians, akin to administrators.

86.     Typically, and contrary to Kentucky law, the Trust would include equivalent language regarding the handling of these required Assignments: "Assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee in recordable form, so that they can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan."   This publicly recorded provision to deliberately keep the transfers out of the public record, violates the Mortgage recording Statute of almost every State of the Union.

87.     While attempting to circumvent Kentucky recording Statutes, the MBS Trust created for itself a situation wherein it had no legally recognizable interest in the loans for the benefit of the investors.   The investors were invested in nothing.   The MBS possessed nothing on the date the REMIC closed and perpetrated a fraud on the investors and the American taxpayer through its fraudulent qualification as a REMIC with the SEC.

88.     No bank, lending institution or "Trustee" ever pledged or put up the money for the Homeowners' loans.   The foreclosing entities had or have no pecuniary, ownership stake or beneficial interest in the homeowners' loans.

89.     A review of the foreclosures filed by the Servicers and "Trusts" typically states that the "Trustee" is the "Holder" of the homeowners' Note.   The

31

Complaint in foreclosure never states that the "Trustee is the owner of the homeowners' Note.

90.     More often than not, the statement that the foreclosing entity "holds" the original Promissory Note is an untruth.   The majority of the securitized Notes no longer exist, having been deliberately destroyed or disposed.   At the time the feeding frenzy of securitization occurred (mostly between 2004 and 2008,) paperwork was of little consequence as the goal of the originators was to fill and securitize as many loans as possible in order to create the loan number list for the SEC.   Likewise, whether or not the loans were ever repaid was of absolutely no consequence as the Servicers and "Trusts" had nothing to loose; the loans having been funded by the investors and were insured by multiple derivative contracts.

91.     Often, and contrary to Kentucky law, the Servicer would have a provision in its Pooling and Servicing Agreement which would allow it to collect and keep the proceeds of any foreclosures it could accomplish after the MBS Trust was paid off by derivatives and closed.   Often, a Servicer will show up in a Kentucky Court to foreclose on behalf of a Trustee who administers a MBS Trust which no longer exists.

92.     In addition, in order to make the Cut Off date to fill the SEC required loan number list, the appraisals for the loan were deliberately inflated as many of the investor Prospectus stated that  all the loans in the bundle met certain criteria, including and most significantly specific loan to value ratios.

93.     When the scheme was originated and implemented en mass (mostly between the years 2004 and 2007), what was not planned for or counted upon was the immediate 2008 massive real estate market collapse and the thousands of voluntary and

involuntary defaults and TILA loan rescissions of mortgage loans.     At the same time, the fair market value of housing dropped by as much as fifty percent (50%) in some parts of the country.

94.     No legal plan was in place for such a wide spread loss of the assets. No legal plan was ever in place to deal with the fact that the original Prospectus to the shareholder/investors was a myth.     No legal plan was ever in place for the shareholder/investors to come to Court in an attempt to collect on the assets of the MBS they purchased.

95.     Most importantly for Kentucky foreclosures and Declaratory actions, the investors or beneficiaries did not have contracts with the Trusts, Servicers,  or Trustees to act on their behalf in a law suit in foreclosure or otherwise.

96.     In order to collect on the mortgage loans and divest Americans of their homes, Servicers and "Trustees" have had to mislead the Courts as to their standing in foreclosure.   They have had to create, forge and fabricate phony documents in order to obtain an Order of Sale in Foreclosure.

### The Creation and Use of Fraudulent Affidavits and Mortgage Assignments:

97.     In a foreclosure, the MBS/Trustee claims to be acting on behalf of the MBS/Trust and claims that it has acquired the loan from the originator.   The multiple transfers of title of the mortgage loan in between the originator and the MBS/Trust is simply ignored as it can never be proved or shown to the Court.   As previously stated, when a Servicer is foreclosing, an additional break in the chain occurs as the Servicer is often never the mortgagee of record under a Mortgage Assignment and has absolutely no

legal tie to the investors in the MBS.  The "Trust" or Servicer can never hold or transfer a Mortgage in the property on behalf of the investors.

98.     In many of the cases, the originator is no longer in business and/or has been dissolved in bankruptcy.   The MBS/Trustee never mentions the intervening transfers to the other parties or the shareholder/investors or to the Court.    The MBS/Trustee never proves that such transfers lawfully occurred.

99.     In the rush to create these trusts and sell shares to investors as fast and in as large a quantity as possible, the loans, Mortgages and Assignments were never prepared, filed or recorded.   This means that the entity seeking to foreclose can NEVER prove the chain of ownership.

100.     When a Servicer shows up in a Kentucky Circuit Court, it is even one more step removed from the ownership of the underlying debt and Mortgage and would NEVER have an ownership claim.    The Homeowner has no idea that it is making payments to, corresponding with and applying for a modification with a mortgage loan servicer instead of a mortgage loan owner or that the Servicer is keeping part or all of proceeds of the mortgage payments without the knowledge or permission of the investors.

101.     In Wall Street's massive feeding frenzy and rush to transform Notes and Mortgages (negotiable instruments) into asset-backed securities, the necessary documents were never prepared or executed from the original lender to the MBS originator, to the Depositor to the Underwriter through the Securitized MBS/Trust to the only possible beneficiaries under the loans, the shareholder/investors.

34

102.    MBS/Trustees and their lawyers discovered in the foreclosure process that the Note and Mortgage Assignments would never be located because they never existed.    They also discovered that states did no allow blank Assignments or Assignments with retroactive effective dates.    To solve the problem of the missing and non-existent Assignments, the MBS/Trustees, their attorneys and their Servicing Agents, decided to fabricate Assignments from thin air and then quietly record the fabricated Assignments.    If a Promissory Note Assignment is presented to the Court, it deliberately do not state the date the promissory Note was assigned.    It was procured after the fact and is based in fraud and in violation of MBS Trusts' tax status requirements.    The dateless Promissory Note Assignment or allonge is then affixed to a copy of the Promissory Note as the original Promissory Note simply does not exist.    The fabricated Promissory Note Assignments are affixed to Motions for Default or Summary Judgment.

103.    The Assignments of the Mortgage were signed and notarized many years after the actual date of the loan and the date listed with the SEC and IRS as the "Closing" of the REMIC.    In every one of these cases, the MBS Trust has been operating illegally as a tax exempt REMIC.    The federal government is in turn, owed billions of dollars in income tax from these entities.    The individual states of the union has causes of action on behalf of their citizens for the unpaid state tax.

104.    Incredibly, most times, the Mortgage Assignments are dated after the filing of the foreclosure.    Most foreclosures are filed without an Assignment at all and the Mortgage attached as the Exhibit is in the name of the original lender or a third nominal party like Mortgage Electron Registration Systems, Inc. ("MERS".)    The

foreclosures are invalid on their face.   The recording statutes of every state in the union have been violated.

105.     The fabricated Assignments were prepared by specially selected law firms and companies that solely specialized in providing "mortgage default services" to the MBS/Trusts and their Servicers.   In Kentucky, it is estimated that over ninety percent (90%) of the filed Mortgage Assignments in the last three years were prepared, fabricated, and filed by the same five or six law firms and default processing companies.

106.     In most cases, the Note and Mortgage were severed or bifurcated at the closing table with the Mortgage being recorded in the name of MERS as "nominee" for the original lender.   However, the original lender never actually loaned any money to the homeowner.   The original lender was never owed or paid any money under the terms of the Note.   There the Mortgage sat for years in the name of an entity, MERS, for which the homeowner owed no money and which would never be beneficiary under the Note. As previously set out, often the MERS held the Mortgage as "nominee" for a lender who was out of business and/or liquidated in bankruptcy.   There could be no party legally able to Assign the Mortgage on behalf of the dissolved lender.   The only party who could authorize the Mortgage Assignment for a bankrupt lender would be the Bankruptcy Trustee.    In these cases where a MERS mortgage has been assigned on behalf of a bankrupt entity, a criminal violation of the bankruptcy code had occurred.

107.     When MERS did not appear as the original Mortgagee, two such Assignments had to be prepared, executed   and filed by the "Trust," its Servicer, a document processing company and/or a foreclosure mill law firm.    The first was prepared in the name of MERS from the original lender; who as previously stated, may

be extinct or bankrupt.   A second bogus Assignment would then have to prepared and filed wherein an agent and sometimes an employee for the entity filing the foreclosure, or an employee of the law firm which filed the foreclosure, would forge the name of or hold themselves out as a Vice-President or executive of MERS.   By drafting, Executing and notarizing the Affidavit or Mortgage Assignment, the forger claimed that they had Mortgage Assignment authority for both MERS and the extinct original lender.

108.    An Assignment from MERS was a legal nullity.   MERS never had a interest in the Note or Mortgage.

109.    Often, the foreclosure mill law firm will sue MERS as a co-defendant with the property owner and then turn around and represent MERS as a Vice-President with the drafting and execution of an affidavit and/or mortgage assignment on MERS behalf.   In other words, the law firm claims to work for MERS, at the same time they are suing MERS.

110.    Often, the same half a dozen names appear on the Mortgage Assignments, which have been filed by the thousands.   Upon information and belief, the printed names on the Mortgage Assignments were not signed by the person whose name appears.   Not only were the robo-signers committing forgery and fraud, it would be physically impossible for them to have signed the tens of thousands of documents filed in Kentucky court and county clerks offices and in the courts and clerks offices across the nation.

111.    In all these cases, the Assignment is prepared to conceal the actual date that the property was to have "passed through" the MBS/Trust to the shareholder/investors.   Note Assignments for non-existent Notes and   Mortgage

Assignment were prepared and filed years after the mortgages and notes were actually fictionally assigned for the benefit of the shareholder/investors prior to the Closing Date of the MBS/Trust.   While exact Closing Dates can only be determined by looking at the MBS/Trust documents, filed with the SEC and IRS, any MBS/Trust that includes the year 2005 in its title closed in 2005.

112.    If a Mortgage Assignment is dated, notarized and filed in a year after the year set forth in the name of the grantee trust, it was an Assignment fraudulently made for the sole purpose of facilitating an illegal foreclosure or to use as evidence as standing in an action to challenge a homeowner's TILA Rescission.

113.    These Specially-Made Assignments have created havoc in the Courts and were done with the specific purpose of perpetrating a fraud on the Court.

114.    In many cases, the foreclosing entities did not even bother to request that the Specially-Made fabricated Assignment be prepared prior to the filing of the foreclosure.   In more cases than not, the Assignments are prepared and filed AFTER the foreclosure action has been initiated.   The MBS/Trust (who has no beneficial interest in the loan and probably is not in possession of the original Note) files a foreclosure and then attempts to make it appear to the Court that the MBS/Trust magically knew prior to the Assignment that it would acquire the defaulting property several weeks or months after the foreclosure is filed.

115.    Courts have repeatedly asked the MBS/Trustee  to explain why they were acquiring non-performing loans and whether such acquisition was a violation of the Trustee's fiduciary duty the beneficiaries under the MBS/Trust.   No MBS/Trustee has ever come forth and explained tat MBS/Trust actually listed the loan in its SEC loan list

without possessing the loan and that the loan was "acquired" years before the Assignment.   As a result, there are many decisions with observations similar to this observation by Judge Arthur M. Schack of Kings County, New York, in *HSBC Bank v. Valentin*, 21 Misc. 3d 1124 [A]:    "Further, according to plaintiff's application, the default of defendants Valentin and Ruiz began with the nonpayment of principal and interest due on January 1, 2007.   Yet four months later, plaintiff HSCB was willing to take an assignment of the instant nonperforming loan, four months in arrears?"

116.    In *Deutsche Bank National Trust Co. v. Harris*, Judge Arthur M. Schack, Kings, New York, Index No. 39192/2007 (05 FEB 2008) opined again: "Further, the Court requires an explanation from an officer of plaintiff DEUTSCHE BANK as to why, in the middle of our national sub-prime mortgage crisis, DEUTSCHE BANK would purchase a non-performing loan from [bankrupt and now dissolved] INDYMAC...."

117.    In cases where the Trust failed to get a valid Assignment, whether before or after the foreclosure, is further complicated by the actual parties participating as Assignors.   Most of the major loan originators, listed on the Mortgages or listed as a "nominee" of MERS on the original Promissory Notes, have been sold, closed or dissolved in bankruptcy.    These include, but are not limited to; American Home Mortgage, Option One Mortgage, Countrywide Home Loans, and INDYMAC.

118.    When these mortgage companies filed for bankruptcy, the Trusts did not claim an interest in the assets (loan lists.)    Years later, when Note and Mortgage Assignments were required for the MBS/Trust or Servicer to attempt foreclosure, a bankruptcy Court's permission  was needed to assign billions of dollars in Notes and

Mortgages.   Knowing that permission would not be granted, permission was NEVER sought in any of the aforementioned bankruptcies.   Hence, the need arose to invent and forge Affidavits and Assignments on behalf of the bankrupt entities.

119.   The similar issue occurs when a Servicer of an MBS/Trust needs to invent an assignment, when the Mortgage is held by the "nominee" MERS.   Like the third-party default service companies, the Servicer fabricates and executes the Assignment on behalf of the Mortgagee MERS.   A double forgery takes place when the Assignor purports to act on behalf of a non-existent or bankrupt entity.

120.   In lieu of valid Promissory Notes, Mortgages and Mortgage Assignments, MBS/Trusts relied and continue to rely on these fabricated documents produced and executed  by their own law firms, Servicers and third-party default service companies.

121.   Although the greatest risk of fraud from the fraudulently produced assignments is imposed on the homeowners, this scheme poses a great risk in the exposure of the Title Companies that guaranteed the clear and correct transfer of ownership.   Additional risk is imposed on both homeowner and the Title Company due to the fact that the loans were never owned by the MBS/Trust, making the clear and correct transfer of title impossible.   The MBS/Trust or Servicer has come to the foreclosure asserting standing when it is neither the owner of the underlying debt or the valid Mortgagee.

122.   The MBS/Trustees have been on notice for several years that the faulty Assignments were likely to jeopardize the claims of ownership and the ability of any

entity to foreclosure.   They have continually failed to disclose this information to the share/holder investors and to the SEC.

123.     Defendants, and other entities such as M&I Bank, Regions Mortgage, Deutsche Bank, U.S. National Bank Association, Bank of America, J.P. Morgan Chase, CITI,   MERS, and Servicing Agents such as GMAC, Aurora Loan Services, CitiMortgage and Nationstar Mortgage, have filed thousands of foreclosure actions in the State of Kentucky and throughout the United States, including against the Class Plaintiffs, under false pretenses, without the legal authority to bring such suits.

124.     Other parties including DOCX, LLC, Lender Processing Services, Inc., in Florida, LSR Processing in Cincinnati, Ohio and the foreclosure mill law firms have facilitated, aided and abetted the Defendants in filing thousands of residential Mortgages and Mortgage Assignments under false pretenses and without legal authority.

### The Double and Triple Dip and Derivative Contracts:

125.     Many of the MBS/Trusts were covered by an insurance policy, commonly referred to as a Derivative or Collateral Contract.   These Derivative Contracts are not recorded or regulated by the SEC.   Upon information and belief, the Defendants have attempted to receive distribution, fees  or proceeds or have received distributions from the liquidation of the Plaintiffs or the putative class members homes, when the actual beneficiaries under the homeowners' loans, the shareholder/investors have been made whole by a Derivative Contract.   In other instances, the MBS has been "closed" months or years prior.   Funds collected from the loans allegedly within the MBS, ar no longer being paid to the investors, but are an unearned windfall to the servicer. Additionally, there is no contract between the investors and the foreclosing entity which

would allow them so act as a Plaintiff in a Foreclosure even when the MBS is not shut down.

126.     Likewise, the MBS/Trusts themselves became parties to Derivative Contracts.  Most times, the actual Derivative contract is for more, up to ten times (10x), the face value of the MBS.  More often than not, multiple insurance policies were taken and traded on the MBS.

127.     The "double dip" or double compensation of the MBS/Trustee, or Sericer is improper in its own right.  The offense is patently egregious when it is viewed in light of the fact that the MBS/Trustee or Servicer.   The bogus entities have no standing to foreclose, yet they came and continue to come to the Courts with the fabricated and forged documents.

### Unjust Enrichment:

128.     The Defendants and MERS have illegally filed suit, as parties and counsel of record, in actions against the Plaintiffs and the putative class members, and have received distributions from the sale of their properties, while engaging in one or more of the following illegal practices:

129.     Defendants have filed foreclosures throughout the State of Kentucky and the United States of America knowing that they were not the "owners" or beneficiaries of the loan they filed foreclosure upon.   They knowingly and intentionally set out to deceive the Courts as to this fact and had full knowledge of the fact that they lacked Constitutionally defined "Standing" and capacity to file suit;

130.     The Defendants and MERS have drafted, executed and filed, or caused to be filed, false and fabricated Promissory Notes, Mortgages, and Assignments of

42

Mortgages, prepared by LPS, by and through DOCX, LSR Processing, employees of foreclosure law firm and employees of the Servicer, in order to foreclose upon properties.

131.    These MERS Mortgages and Assignments were prepared by an agreement between the Defendants.   These Defendants used false information regarding the individuals executing such Mortgages and Assignments, holding such individuals out to be officers of various banks, mortgage companies and mortgage servicing companies and MERS.   At the time the Assignments were executed, many of these companies no longer existed and/or had been dissolved in bankruptcy;

132.    Defendants used these MERS Mortgages and Assignments as Exhibits to foreclosures and filed these Assignments in the public record in all one hundred twenty (120) Counties in the State of Kentucky.   In all such cases and public recording, essential documentation to prove chain of title   had not been obtained.   The essential documentation to prove chain of title does not exist.

133.    Defendants filed or caused to be filed MERS Mortgages and Assignments of Mortgages prepared by Defendants with forged signatures of individuals purported to be officers of the entity, such as MERS or bank or mortgage company making the assignment;

134.    Defendants repeatedly filed foreclosure and declaratory judgment actions on TILA Rescissions months and sometimes over a year before they acquired any legal interest in the subject property through a fraudulent Assignment of a Mortgage. They have repeatedly claimed and continue to falsely claim that they owned the note executed with the mortgage on the property;

43

135.    Defendants repeatedly filed foreclosures and continue to file foreclosure actions claiming that they have lost the Promissory Note, Mortgage and other necessary documentation or that the documentation is "unavailable."   They falsely lead the Court to believe by inference or actual testimony, that the documentation is missing SUBSEQUENT to the acquisition of the documents, when in fact they have never possessed such documents;

136.    Defendants have filed other altered or fabricated documents in many foreclosure cases to support their claims of ownership, including fabricating and filing multiple Assignments in blank with no dates on copies of the Promissory Notes (many times from non-existent  or bankruptcy dissolved entities) and multiple Mortgage Assignments with different dates, bank officers signatures, witnesses and notaries for the same residential property.   Often, the same individuals appear as the signatory for multiple banks and mortgage companies at the same time and simultaneously act as a signatory for the entity MERS;

137.    Defendants have repeatedly filed and continue to file foreclosure actions as a  Trustee for a SEC registered MBS/trust where the chain of title has not and can not be established by Defendants and/or the MBS no longer exists and was never qualified to be a REMIC.

138.    The Defendants in many cases have filed and continue to file foreclosure actions where the individual loan in question was never on the SEC loan list submitted on behalf of the MBS/Trust.   In other instances, the individual loan number appear on multiple loan lists inside multiple MBS/Trusts  or has been removed from the

list of the MBS/Trust.    While in others, the individual loan number is listed with a MBS/Trust which has been closed or no longer exists.

139.    In this action, Plaintiffs seek to recover actual and statutory damages, as well as attorneys' fees and costs as permitted by law.

### IV.  THE CONSPIRATORS' BUSINESS MODEL

140.    In and about the years 1998 and 1999, with the final desecration of the Glass-Steagall Act, the mortgage industry introduced new "products" into the American marketplace in order to create massive amounts of mortgage loan "lists" to be listed as the assets of Mortgage Backed Securities, ("MBS".)    The borrowers taking out these loans were unaware of the fact that their loan was never a true negotiable instrument, but securitized and sold prior to them ever reaching the closing table.    These products included "non-documentation loans" and adjustable rate mortgages, known as "ARMS." Mortgage lenders, acting in coordination with one another, relaxed their standards for lending, which made an entirely new class of lower-income individuals eligible to receive loans. This, in turn, artificially drove up property "values." As part and parcel of this scheme, investment "banks" and other lenders accepted appraisals "documenting" the new, higher values, and approved hundreds of thousands of applications for financing, most of which would normally have been declined.

141.    Unbeknownst to the borrowers and the public, the billions of dollars spent to fund these loans were expended to "prime the pump."    The big institutions and the conspirators were making an investment, but the expected return was not the interest they pretended to anticipate receiving as borrowers paid the mortgages. The lenders knew that the new loans were "bad paper;" this was of little concern to them because they

intended to realize profits so great as to render such interest, even if it had been received, negligible by comparison.

142.     Part of the reason this fraudulent scheme has gone largely unnoticed for such an extended period of time is that its sophistication is beyond the imagination of average persons. Similarly beyond the imagination of most persons is and was the scope of the dishonesty of the lenders and the investment Banks and those acting in furtherance of the scheme, including the present Defendants. Through the present time, persons acting within the ambit of this conspiracy, have continued to operate consistent with the core principles of dishonesty and fraud engendered by the original conspirators.

143.     These corrupt influences have spread throughout the financial services, lending and banking industries into the national economy and beyond, threatening the economic stability of the United States and the world as a whole. This Court is urged in the strongest possible way to apply a presumption of falsity when reviewing any documentary evidence filed in this Court by one or more of the Defendants. Such a presumption is not just warranted; it is t indeed compelled by the extent to which the Defendants and those with which they are associated have long acted in a malicious and wanton manner evincing complete contempt for the judicial process and the rights of persons having interests contrary to their own.

144.     This is particularly true because the Defendants' contempt for due process is compounded by their specific intention to obviate the requirement that documents prepared for legal use be truthful, authentic, and legitimate.

145.    There is one sort of lie that, when later discovered, constitutes the strongest possible proof of a person's malicious intentions, that is to say, the lie about one's name or identity in relation to whether a person owes money.

146.    Many such lies are present in this instance. The whole purpose of MERS is to allow "servicers" to pretend as if they are someone else: the "owners" of the mortgage, or the real parties in interest. In fact they are not. The standard MERS Mortgage Complaint contains at least one to three lies as to the identity of the parties.

147.    While the title of the standard foreclosure Complaint makes reference to "unavailable" Promissory Notes in the body of the Complaint, the Defendant Firm alleges that the plaintiff is the "owner and holder" of the note and mortgage.

148.    In the years leading up to the introduction of the new loan "products," and securitized mortgage loans, the conspirators laid the groundwork which would grow into a new mortgage lending infrastructure: a new paradigm in which the ratios of risk to reward were dramatically altered in favor of these Wall Street interests and to the detriment of common consumers.

149.    One material bulwark in the support for this new paradigm was the inclusion in new mortgages of intentionally ambiguous and infinitely malleable provisions pertaining to MERS.[3]    As is the case with most of the written documents routinely used in the scheme, such as "assignments" and complaints for foreclosure, each word concerning MERS in these standardized mortgages is carefully crafted so as to

---

[3] This allows for another "nominee;" one which could apparently coexist with MERS. "Is" is present tense - - this seems to indicate that as of the time of execution of the mortgage, MERS was performing some unknown service for both lender and its "successors and assigns" even though ostensibly the mortgage had not as of execution been assigned. Upon assignment, it would seem to be impossible for MERS to act as "nominee" for the original lender. This phrase also tacitly acknowledges that the mortgage will be assigned. Bypassing Black's Law Dictionary, "mortgagee: n. the person or business making a loan that is secured by the real property of the person (mortgagor) who owes him/her/it money." *See*   www.law.dictionary.com

allow those relying upon it to infinitely recede in their positions and to be moving targets virtually unreachable by standard legal means.

150.    Upon reading the standard mortgage clauses pertaining to MERS, even persons of high intelligence will have a sense that they should, but do not quite, comprehend them. Consider these:

151.    "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a₃ nominee for Lender and Lender's successors and assigns.   MERS is the mortgagee under the security instrument.   This Security Instrument secures to Lender: (1) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (2) the performance of Borrower's covenants.    There is no "purpose" stated in the preceding sentence.    This begs the question as to the following:    How can the borrower simultaneously "convey" the property to: (1) MERS as nominee for lender; (2) MERS as nominee for lender's successors and assigns; and (3) MERS's *own* successors and assigns? Furthermore, who are the successors and assigns to an entity with absolutely no interest in the Promissory Note for which the mortgage was allegedly based?    No assignment could have existed as of the moment the mortgage was executed by the borrowers, and if somehow same did exist, it should have been disclosed as a fundamental and material aspect of the transaction. If the assignment occurred prior to the mortgage, the mortgage itself is void.

152.    because the lender had no interest to secure.  No "law or custom" could possibly necessitate action by MERS, as opposed to action by the original lender.

153.    A mortgage is not a conveyance of property by operation of Kentucky law.   It is merely the public evidence of a lien in property.   Furthermore since an entity

can not assign something it had no rights in the first place, any and all Mortgage assignment from MERS to a third party are null and void.

154.     Beginning soon after the "ink" on the new mortgages was "dry," and in many cases prior to the loan even closing, the lenders promptly sold the loans, in secretive transactions, to "investors" for some percentage or fraction of what had been the alleged value of the mortgage and the property by which it was secured just days or weeks earlier.   In most cases, the Lender did not advance any funds as to the loan, serving as a strawman, thereby negating the validity of each and every one of the required TILA disclosures.

155.     Another part of the scheme was the use of words in ways inconsistent with their traditional meanings, and the creation of new terms which could be used to blur important distinctions between parties and their interests. The revolutionary ways in which words were utilized all shared one characteristic: they made it more difficult to determine who had the right to receive and utilize for their own purposes the payments made on the loan by the borrower. For example, "mortgagee" began to have a meaning other than "lender."   "Servicer," which has no legal definition, arose to prominence and was and is used to further obscure important truths.   Specifically, the "servicer" does not hold the true beneficial interest in the mortgage.   The Defendants will not release any further information on the subject, whether it is requested in discovery in a foreclosure action or in any other context.

156.     Attorneys have been told in open Court by the counsel of record for the foreclosing Servicer, that "it is none of the borrowers business" who owns or in the case of a closed MBS, who owned their loan before the MBS REMIC became extinct.

49

157.     With the oversight of Defendant Merscorp and its principals, the MERS artifice and enterprise evolved into an "ultra-fictitious" entity.   To perpetuate the scheme, MERS was and is used in a way so that to the average consumer, or even legal professional, can never determine who or what was or is ultimately receiving the benefits of any mortgage payments. The conspirators set about to confuse everyone as to who owned what. They created a truly effective smokescreen which has left the public and most of the judiciary operating "in the dark" through the present time.

158.     On its website, www.mersinc.org, Defendant Merscorp lists the shareholders of "MERS," which is defined on a separate page of the site as "Mortgage Electronic Registration Systems, Inc." Among the shareholders of MERS, according to the site, are the following institutions: Bank of America, Chase, CitiMortgage, Inc., Fannie Mae, Freddie Mac, HSBC, SunTrust, and Wells Fargo. These entities are co-conspirators in the MERS scheme herein described.

159.     The conspirators intended to maintain an absolute stranglehold on the American economy for many decades into the future. This could only be accomplished if the scheme was able to evolve over time in a changing regulatory and consumer environment.

160.     The conspirators adjusted the American lending system and the legal system governing it in a way designed to most effectively gratify their greedy interests over the longest period of time.

161.     Through this revolution in the use of words and ephemeral concepts such as the "nominee," "servicer" and "Trustee," the conspirators, including the present Defendants, have by-and-large been successful in changing the paradigm so that the

50