rights of individuals are no longer afforded the safeguards which have been carefully maintained in place since the formation of the United States.

162.    As the conspirators and present Defendants have long intended, certain important terms in the mortgages and other legal documents are devolving into a state of meaninglessness.   Even the names of the mortgage and lending institutions are tinkered with and interchanged so often that it is difficult to keep track of the constantly shifting parameters of the series of alleged mergers, assertions of subsidiary relationships.

163.    This is not some random trend which resulted from the mortgage crisis. It is, instead, the calculated tactic and conspiracy which ultimately caused it. The end result of the continued actions is that the mortgages and associated documents come to mean whatever their proponents wish them to mean.

164.    The conspirators did not want there to be any documentation which could later potentially be used as evidence of their crimes. They did not want to pay the fees associated with recording mortgages, robbing the County clerks across the nation of billions of dollars in statutorily mandated Recording Fees. They did not want to be bothered with the trouble of keeping track of the originals pf Promissory Notes as they have felt at all times that they are above the law. This is the significance of the word 'Electronic' in Mortgage Electronic Registration Systems, Inc. The conspirators, through this exceptionally sophisticated legerdemain, made over the American judicial system's long-honored requirements for mortgages and foreclosures to serve their interests and to minimize the possibilities of the victims obtaining any meaningful redress through the courts.

165.    They have so far,  undermined long-established rights and sabotaged the judicial process itself by de-emphasizing the importance of, and eventually eliminating, "troublesome" documentation requirements which in all jurisdictions of the United States MUST BE IN WRITING.    If a conversion to electronic loan documentation is ever  implemented, it would be the voting public, by and through their elected representatives  through duly enacted  constitutional legislation.

### The Creation and Use of Fraudulent Promissory Notes and Mortgage Assignments:

166.    In these remarkable and totally fraudulent Affidavits and "assignments" as to loan ownership,  the following irregularities usually appeared:    The assignor, MERS, had the same address as the assignee (the plaintiff); they were executed by a person having the title of "Vice President or Assistant Secretary of MERS;" and the document would have an "effective date" well prior to the date upon which it was executed, so as to retroactively give standing to the plaintiff.

167.    It has now come to light that the persons signing these assignments as "Assistant Secretary," and "Vice President" of MERS actually were never officers or employees of MERS.    Rather, they employees of the foreclosing "servicer" or incredibly, the Servicer's Law Firm.

168.    The preparation, filing, and prosecution of the complaints to Foreclose and to Enforce  loan without any documents were each predicate acts in the pattern of racketeering activity

169.    In furtherance of the MERS enterprise. The actions could not have been brought by the Defendants without the MERS artifice and the ability to generate any necessary affidavits or "assignment" which flowed from it.

52

170.     As with MERS model itself, the affidavits and "assignments" were meaningless shells designed to pull the wool over the eyes of the judiciary and ease the burden upon the unknown real parties in interest. The practice of "non-documentation" can be seen as a common thread weaving all of the complained-of conduct into an undeniable tapestry of a criminal enterprise proscribed by RICO.

## V.   STATEMENT OF RELEVANT KENTUCKY LAW AND THE UNIFORM COMMERCIAL CODE

171.     The alleged Notes in question, started their life as negotiable instruments. They were similar to a check. The negotiation and enforceability of both notes and checks are governed by Article Three (3) of the Uniform Commercial Code. To enforce a  negotiable instrument, a person must be a holder of the note.  KRS 355.3-301.  To meet the definition of a "holder," the person must possess the note, and the note must be issued or endorsed to him or to his order or to bearer or in blank.  KRS 355.1-201(2)(u).  The record reflects that  Plaintiff is not the "holder" or "owner" of the Note. Neither does it appear in the record of this case to be any evidence that the Plaintiff will ever be the "Bearer" of the Note, under KRS 355.1-201(2)(u), wherein the Plaintiff could ever be "a person in possession of a negotiable instrument, document of title, or certificated security that is payable to bearer or indorsed in blank."    KRS 355.1-201(2)(e).  The Plaintiff is not in possession of the original negotiable instrument with any legally binding original endorsement.

172.     If the Party, at a later date, attempts to claim that the original documentation was somehow "lost," the Note will never be enforceable, as  made obvious by official comments to the UCC § 355.3-203, that read as follows: " X signs a document conveying all of X's right, title, and interest in the instrument to Y.   Although

53

the document may be effective to give Y a claim to ownership of the instrument, Y is not a person entitled to enforce the instrument until Y obtains possession of the instrument. No transfer of the instrument occurs under Section 3-203(a) until it is delivered to Y."

173.    Based on the record in the Plaintiffs' cases, and the class members' loans, the Note and the Mortgage were bifurcated at inception and were and remain unenforceable as a Secured Transaction under the Uniform Commercial Code and Kentucky law.  The most the Plaintiff could ever be is an unsecured creditor.

174.    Upon information and belief, the Note, the Note was "securitized," was paid off in excess of the principal balance and is no longer enforceable as a Secured Negotiable Instrument.

175.    If an enforceable transaction can be proven, the Defendants were deceived into such transaction without notice that they were encumbering the property as a "Security" under the Rules and regulations of the Securities and Exchange Commission.

176.    The Party does not hold, bear or own the original Note, is not a Mortgagee and has no legally enforceable interest in the loan or standing to file this action.

177.    There is no assignment of the Promissory Note to the foreclosing Party. The endorsement stamped on the copy of the Note as Exhibit "A" to the Complaint, bears no signature and is invalid.

178.    The alleged Affidavits of ownership and Account Status and the Assignment of the Mortgage are believed to be forged instruments.  Those forged

instruments have been uttered or published into the public record, Mortgage Fraud and Forgery violations have occurred.

179.    It is asserted that the Law Firm initiating this action and the Plaintiff, have conspired with each other and their other agents and principals to file a false and fraudulent Foreclosure Action and to later create a false and forged Mortgage Assignment. It is asserted that such action is part of the Law Firm's regular practice and procedure, whereby it engages in systemic fraud across the Commonwealth of Kentucky, in conspiracy with its clients.

180.    During the origination of the loan, the Lender, MERS, the Broker, the Plaintiff (if it funded the loan and was the "true lender"), and the Title Company conspired together commit illegal acts pursuant Federal and State law.

181.    Moreover, the so-called "bogus note" submitted with this Complaint and "lost note" Complaints, filed by the thousands in the past three (3) years in Kentucky, present issues of more interest than the basic enforcement of the Uniform Commercial Code. When a Court Orders the Foreclosure and Order of Sale on Kentucky real estate, based solely on sham pleadings, the entire community is affected as well as the home owner. If a Kentucky citizen sat through the average foreclosure chocked Circuit Court Motion docket, in any given County, he would see that very few, foreclosures are defended. Therefore, most Kentucky families lose their property and their homes by default, regardless of whether the foreclosing entity has any rights in the debt.4

---

4   Since Foreclosure defense has not proved financially lucrative for attorneys, most property owners are left out in the cold and without legal representation.

182.    In other jurisdictions, such as Ohio, New York and Florida, the judiciary has taken upon itself to recognize its duty to protect its property owners and communities from illegal Foreclosures, especially when the property owner is not represented by counsel and a Foreclosure by Default has been requested. The Florida Attorney General   and the United States Attorney in Florida both have public investigations against a   Foreclosure Factory law firm and a Document Processing Corporation as to the Post- Foreclosure Mortgage Assignments forgery issues identical in this case.

183.    In today's environment, in which mortgage notes are freely traded, and serve as collateral for various investment vehicles this "owner of the claim issue" is more important than ever to a defendant: a.)   to determine whether the Note and Mortgage have been bifurcated and issued to separate entities, making  neither enforceable; b.)  to determine whether a real "holder"  or "bearer" of the Note even exists; c.)  to determine whether the debt has been paid in a credit default swap (Insurance Policy) a derivative contract, or by the Servicer under a Pooling Agreement; d.)   if the Note was in fact "securitized," hence becoming a  "Security" it was no  longer a  Negotiable Instrument/Mortgage Note and under Kentucky law, was paid in full, has been satisfied and is no longer enforceable as a Mortgage Note; e.)  to have Mortgages declared void and titles quieted whenever mortgages have been recorded in the name of the entity MERS.

## VI.  NATIONAL HISTORIC BACKGROUND AND SIGNIFICANCE

184.    In the United States, home purchases are typically financed by mortgages or loans that are secured by a mortgage (in judicial foreclosure states) or deed

of trust ( in non-judicial foreclosure states) and a note which, when executed on behalf of the same entity and held by the same entity as a "note and deed of trust", entitle the holder of the note and deed of trust to foreclose on the property of the borrower if the borrower is in default without legal excuse or recourse.

185.    According to CNNmoney.com, beginning in 2008, U.S. foreclosure filings spiked by more than 81% in one year, a record in the United States.  Foreclosures were up 225% compared with 2006 figures.  A reported excess of ten (10) million foreclosures have occurred in the U.S. since 2008.  The peak in foreclosures is not predicted to occur until the end of 2011.

186.    From 2003 through 2008, the Defendants entered into mortgages with mortgages deeds of trust and notes nationwide that were intentionally separated after the execution of the mortgage, the note was warehoused and alleged to have been sold to an investor who literally and actually provided the funds for the loan given to the borrower, and the note was in whole or in part allegedly conveyed to that investor by means of deposit in a mortgage backed security pool ("MBS."). In essence, prior to the contract being signed by the borrower, the note was funded by a party other than the originator or servicer of the loan.   The MBS was literally created and funded prior to the borrower ever taking out a loan.    Therefore, the MBS underwriter/originator or servicer (in GMAC's case they are one in the same,) had to go create loans after the fact which loosely matched the description of the prospectus used to entice investors into the MBS. Most times, the ratings Agency, such as Moody's would give the MBS its AAA rating even thought the loans had yet to be created or originated.

187.    Most importantly, for purposes of the nationwide foreclosure frenzy,

the investors, do not attempt to call defaults upon the borrowers nor do the investors threatened to foreclose or foreclose.    The entity filing foreclosure has absolutely NO financial stake in the mortgage loan.    If they did, the MBS would lose its REMIC pass through tax status.    Most importantly the foreclosing entities have NO agreement with the Trust or Servicer to act on their behalf.    In fact, the Pooling and Servicing Agreements forbid the Trustees or Servicers from filing actions on the investors behalf.

188.    Nationwide, the mortgages and Deed of Trusts, name a party as the "lender" who did not fund the mortgage and had no intention of funding the mortgage; yet, that "lender" who had no beneficial interest named MERS as the beneficiary and MERS had no beneficial interest nor did MERS represent any party to the deed of trust who had a beneficial interest. Each mortgage and deed of trust was, therefore, void upon execution because the statements contained therein were untrue and the failure to disclose these facts to the borrower acted to the borrower's detriment and there was no meeting of the minds, no consideration and an utter failure to create a security instrument.

189.    Nationwide, borrowers execute the note and then separately execute the mortgage or deed of trust naming MERS as the beneficiary and/or nominee of the beneficiary/lender.    At inception, the note was separated from the mortgage or deed of trust.

190.    This concept was unheard of in state property law in every state and territory of the union until these Defendants created these fictional documents and these fictional beneficial interests, and fictional lenders.

191.    After the execution of the documents, with the note being allegedly transferred to investors whose money had funded the loans taken out by the

Plaintiffs/borrowers, the failed mortgage or deed of trust was kept with MERS listed as the beneficiary, but the notes were transferred to parties outside the MERS system in violation of the rules and policies adopted by MERS.

192.    It is predicted that in at least seventy percent (70%) of the nationwide mortgages and Deeds of Trust registered to MER in America, the "lender" that MERS claims to be a "nominee" for is no longer in business and/or has been liquidated in bankruptcy.    MERS, at the moment of the note's transfer to another party, or the "lender's" demise, MERS could not possibly have an agency/beneficiary/nominee status with the "lender." There is no further authority to substitute a mortgagee or trustee or transfer any other interest in the mortgage or deed of trust to any party. No party that has initiated foreclosure or intends to initiate foreclosure on any MERS mortgage has any authority to and holds, at most, an unsecured note in favor of the real parties in interest of the note, the investor/owners; if and only if they can prove they have an agency relationship with the owners and if they can show that they owners have not already been made whole by a derivative contract.

193.    Simultaneously with or immediately after the loans were taken out by borrowers nationwide, the obligations reflected by the notes were satisfied by monies provided by the investors who then obtained ownership of and right to payments under the terms of the note.  These investors are the only parties to whom any obligation arose after the loan was securitized, and are the only proper parties, but these parties have no recorded interest in the mortgage or deed of trust, which was never delivered to the Trustee for the mortgage backed security pool and, therefore, the note itself, is at best unsecured rights to payment.

194.    The note, that had been executed with the mortgages or deed of trust were separated from the mortgages and deed of trust in that the note became part of a pool of mortgages; thereby losing its individual identity as a note between a lender and a borrower.   The note instead merged with other unknown notes as a total obligation due to the investor or investors.   The note is no longer a negotiable instrument, but collateral for a Federally regulated Security under the confines of the SEC.

195.    MERS was created by its owners to work with investment banks and "lenders" as co-conspirators in relation to the MERS system with the specific intent that MERS would be named the beneficiary and/or as the nominee of the lender on the mortgages and deeds of trust which borrowers nationwide were induced into signing.

196.    However, MERS was not the "nominee" for the lenders, but was the agent for the servicers.   The true lenders were investors who had provided the funds for the loans through mortgage backed security pools which were held as trusts.   This fact was known to MERS and the purported lender and the subsequent assignee of any and all rights purported to have been assigned by MERS at the time the note and mortgage or deed of trust was signed by borrowers at the time of each and every such later purported assignment by MERS of any interest in the note and deed of trust.

197.    The foreclosures filed in the past, present and in the future bearing a recorded mortgage or deed of trust in MERS name have been and continue to be initiated nationwide by parties who have no right to declare default, have failed to provide an accounting of the amounts due and owing to the true beneficiary, who are the only parties with the right to declare such default.

198.    The Servicers, such as GMAC, did not fund the loans of the nation's

60

borrowers with any of its own assets and is not owed any of the funds to be repaid by the nations' borrowers. The Servicers and MERS do not stand to suffer any loss should they be enjoined from foreclosing on real estate nationwide and have no right to foreclose on behalf of unknown investors because of a lack of agency, lack of authority and lack of knowledge of whether the note has been discharged.5

199. All Defendants knew that prior to the time that the loan was taken out by the nation's borrowers, a loan which named MERS on the mortgage was securitized or intended to be securitized prior to the preparation of the note and mortgage reflecting the loan. Defendants also knew that the scheme employed by all Defendants involved in the origination, aggregation and securitization of mortgage-backed loans originated from 2003 through 2009 and secured by real property in the United States included financial incentives which were designed to result in the loans being written on terms which were likely or certain to result in foreclosure, and that the scheme described herein included financial incentives designed to motivate appraisers, mortgage brokers, lenders, aggregator banks and securitizing banks to steer borrowers into loans they could not afford and could not repay so that the loans would go into default and the Defendants involved in servicing, aggregating and securitizing those loans could make yet more profits from default, foreclosure and selling the properties after foreclosure.

200. The financial incentives mentioned in the previous paragraph included without limitation the hiring of appraisers who had financial incentive to appraise properties at a value that would justify the loan requested, the payment to mortgage

---

5 The logical question raised is "what does the Servicer, like GMAC have to gain by foreclosing." The Answer comes from the plain language of the standard Prospectus and Pooling and Service Agreements, which allow the Servicers to keep the proceeds of the foreclosures when the MBS has been closed or the investors paid off.

brokers of higher fees for sub-prime and sub-sub-prime loans than for prime loans and the use of novel and unprecedented underwriting criteria such as stated income and 100% or more financing of the purchase price, and the purchase of loans from lenders by aggregators and servicers of loans at more than face value if the loans were sub-prime or sub-sub-prime and if such loans also included an adjustable interest rate and/or a pre-payment penalty. In the case of many of the nation's borrowers the loans were advanced based upon the value of the house itself and not the income of the borrower. Also, in this case, the equity in the house itself was used to secure more loans based upon the value of the home when that value was exaggerated by the market manipulated by the Defendants and which is clearly not in the interest of the borrowers for an initial purchase or refinancing of property.

201.    The Defendants who originated, serviced, aggregated and/or securitized the loans knew or should have known at the time of those actions by Defendants that the financial incentives described in the previous paragraph herein were not disclosed to the investor or to the nation's borrowers, and that the Defendants who originated, serviced, aggregated and/or securitized the Plaintiff's loan also purchased credit default swaps which were essentially bets that the Plaintiff's loan would fail, resulting in multiple payments to those Defendants of the face amount of the loan, and knew or should have known that fact was also concealed from the investors and Plaintiffs who were instead intentionally misled by Defendants to believe that the Plaintiffs qualified for the loans under residential loan underwriting standards used in the industry.

202.    All Defendants who originated, serviced, aggregated and/or securitized the Plaintiff's loan knew or should have known at the time of those actions by

Defendants that the more likely or certain the loans were to fail, the more likely that failure was to cause the entire mortgage-backed security pool, to fail, and the more profitable those events would be to Defendants.

203.     The investors and the borrowers were entitled to information regarding all of the profits, payments, kick-backs, fees and insurance and credit default swaps related to the transactions which included the identity of the investors providing the funds loaned to the borrowers, and the concealment of those facts by all the Defendants who originated, serviced, aggregated and/or securitized the loans was an intentional misrepresentation and/or intentional material omission of fact by those Defendants for the purpose of using the borrowers' signature on a note and deed of trust to defraud the investors and the borrowers.  These Defendants, upon information and belief, falsely told the FDIC or the federal government or the federal reserve that the Defendants were in dire need of trillions of dollars in federal funds due to "toxic assets" being allegedly on the books of Defendants and those "toxic assets" included the loan to the borrowers for which they were not qualified, but were encouraged and induced by the Defendants to enter into the loan and to default on the loan in order for the Defendants to foreclose.

204.     All Defendants participated in a conspiracy to cause borrowers to enter into instruments that would result in the foreclosure on their home and the loss of their investment and to initiate and complete foreclosure on the borrower's house without the lawful right to do so or to commence and advance foreclosure against the borrowers with knowledge that the borrowers had been deceived by having not been informed that the loan they took out was intended to result in foreclosure and consequently more profits to the Defendants.  As a proximate and direct result, soon to be named Defendant servicers,

such as GMAC, have been unjustly enriched by the payments of the Plaintiffs on the note and by the profits earned by Defendants from the declarations of default, the commencement and advancement of foreclosure on the borrower's property and will be unjustly enriched if allowed to keep the property of the Plaintiff.

205.     The lenders and investors in mortgage-backed securities, including some of the Defendants, have obtained bailout money from the United States Treasury and the Federal Reserve in the amount of trillions of dollars for the stated purpose of compensating the lenders and investors for losses sustained due to the alleged default on residential mortgage loans including those of Plaintiffs.

206.     The lenders, servicers and investors in mortgage backed securities, have used those funds to repay investors who funded loans and/or to settle the lawsuits of those investors against the securitizing banks for fraud, with such use of those funds having extinguished the obligations reflected by the note that was executed by the borrowers and thus have no right to collect on the note, and had no right to initiate the foreclosure on all borrower's  homes bearing a mortgage or deed of trust in the name of MERS.

207.     The nationwide Class have mortgages or deed of trust that states that the beneficiary and/or beneficiary as the nominee of the lender is MERS.   Some of the Class members have been have been declared in default by parties not entitled to declare the default.  Even though the Borrowers/Plaintiffs did pay the payments agreed in the "Note," and, in fact, invested their savings in the home based upon the representations of the Defendants, the Defendants have foreclosed and intend to foreclose and take the Plaintiff's property without stating who holds the note and to whom payment is due on

64

the note and what amount is due on the note.

208.    Defendants' use of MERS created the method to defraud the Home Purchaser, the nationwide Class herein, because MERS was not the holder of the Note and MERS was not a transferee in possession entitled to the rights of a holder or had authority under State law to act for the holder. Neither does MERS have the authority to appoint a successor "nominee.".

209.    The entities that have foreclosed or will attempt to give notice that they will foreclose on the home of the nationwide class are not MERS and are not the parties that funded the loan of the borrowers.

210.    The nationwide class of borrowers executed notes and mortgages on their property under circumstances that were predatory lending and all the defendants herein are now in a position to have taken advantage of the predatory lending or are now in a position of taking advantage of the predatory lending and, thus, all are liable for the predatory lending.

211.    Defendants knew that the business practices in which they were engaged would result in driving the market for housing into unnaturally high demand which would cause the prices on home to escalate beyond their normal and reasonable value and further knew that lending money to persons who were not qualified in such large numbers would cause the market to eventually crash. The Defendants believed this to the extent that the Defendants purchased credit default swaps, in essence, side bets that bet that the Plaintiffs and other loans given in the same time frame and under the same circumstances would fail.

## VII.  CLASS ALLEGATIONS

### The Class Defined:

212.     This Class Action is being filed by the Plaintiffs, pursuant to the Federal Rules of Civil Procedure 23, on behalf of themselves and other similarly situated.

213.     Plaintiffs bring the action on behalf of themselves and all other persons similarly situated as proposed Plaintiff Class.   The Plaintiff Class is defined as:

214.     All persons holding the deed to any property in the Commonwealth of Kentucky and nationwide who since 2006,  are currently in foreclosure or   TILA Regulation Z litigation, with pending litigation, or have been foreclosed upon and lost title to their property, since 2006, by judicial or non-judicial methods, who have been damaged and/or are entitled to Injunctive Relief and monetary damages against the Defendants, when the Defendants filed the foreclosure, were involved in the drafting, executing and filing of Promissory Note, Promissory Note Assignment, a Mortgage in the name of MERS, or where an fraudulent and forged affidavit or Mortgage Assignment were filed in the public record, to obtain the foreclosure, or;

215.     The Foreclosure was filed and has been dismissed or is pending by or with the involvement of any or all of the Defendants either in their own behalf or as a Servicer or third party "nominee," or "Trustee" and MERS is  or ever was a recorded Mortgagee, or Mortgagor or;

216.     There is a recorded mortgage in the public record, naming MERS as a Mortgagee regardless of whether there is any litigation in the public record as to the property.   In other words, the class consists of all persons whose

property has ever been encumbered by a mortgage in the name Mortgage Electronic Registration Systems.

### Existence of an Identifiable Class Fed. R. Civ. P. 23.01(a):

217.   The Representaive Plaintiffs to this action fulfill the prerequisites of a class action to represent the interests of the putative class members.   The proposed Class definition is sufficiently definite so that it is administratively feasible for the Court to determine whether a particular individual is a member by Court records, public mortgage records, land records and the records in the hands of the Defendants.

### Numerosity of the Class Fed. R. Civ. P. 23.01(a)(1):

218.   The class consists of individuals throughout all 120 Counties of the Commonwealth of Kentucky, and every state and US Territory, making joinder impractical, and in satisfaction of  Fed. R. Civ. P. 23.01(a)(1.)   Class members are predicted to number in the tens of thousands.   The precise number of class members in unknown at this time, but can easily be obtained through public record and the electronic databases of the Defendants.   Class members can be notified of the pendency of this action based on the public record utilized by the Defendants to serve the property owners with a Complaint in Foreclosure.   The disposition of the claims of the Class members in a single Class Action will provide substantial benefits to all parties and to the Court.

### The Existence of Common Questions of Fact or Law Fed. R. Civ. P. 23.01(a)(2):

219.   The Class Representatives allege that the questions of law and fact relating to their claims predominate over any questions affecting solely individual members in satisfaction of Fed. R. Civ. P. 23.01(a)(2):

220.     There are questions of law or fact common to the class including, but not limited to:

a.)     Whether filing a foreclosure without standing and without the right or ability to obtain and record a Mortgage and/or Assignment of Mortgage, or Assignment of the original Promissory Note for which the claim is based, constitutes false, misleading deceptive, fraudulent, criminal or other wise illegal conduct under the law;

b.)   Whether filing and pursuing a foreclosure suit using and publicly recording a false Promissory Note, Note Assignment, Mortgage, affidavit, or Mortgage Assignment with forged signatures, erroneous information regarding the authority of the signors, and/or erroneous information regarding the date the transfer actually occurred constitutes false, misleading, deceptive, fraudulent, criminal or otherwise illegal conduct under the law.

c.)   Whether a criminal and civil conspiracy existed and continues to exist in regards to the Defendants actions.

d.)    Whether mortgages recorded in the name of MERS are illegal and unenforceable.

e.)   Whether Plaintiffs and Class Members have been damaged or injured by Defendants' conduct;

f.)    Whether Plaintiffs and Class Members are entitled to compensatory damages, and the amount of such damages;

g.)   Whether Plaintiffs and Class Members are entitled to statutory damages, common law damages and treble damages under the law as well as costs and attorneys fees and the amount of such damages; and

h.)   Whether Plaintiffs and Class Members are entitled to punitive damages and the amount of such damages.

### Typicality Fed. R. Civ. P. 23.01(a)(3):

221.   Plaintiffs' claims are typical of the claims of the Class as the Defendants in collusion with each other initiated loans, filed mortgages, recorded and illegally transferred mortgages and initiated  Complaints in foreclosure, stole the Plaintiffs' property by foreclosing against the Plaintiffs' property illegally; wherein all mortgages in question having been originally recorded in the name of the Defendant MERS or subsequently assigned to MERS.

### Adequacy Fed. R. Civ. P. 23.01(a)(4)::

222.   The Plaintiffs are adequate representatives of the Class because their interests overlap and are not in conflict with the interests of the Class.   The Plaintiffs, as represented by qualified counsel, intend to prosecute the action vigorously and behalf of the   Class and indirectly on behalf of the taxpayers and property owners across the Commonwealth of Kentucky and the nation who may not be members of the Class, but will benefit from the Class when the Defendants actions in illegal foreclosure cases cease and desist by Court Order.   Further, the Class is adequate to protect and preserve the deeds and title to land for future generations as the illegal foreclosure already performed have "dirtied" the title for any and all property liquidated by Court Order since 2006, or

for which property is currently encumbered in the public record by a mortgage in the name of MERS.

### Class Action Maintainable Fed. R. Civ. P. 23.01(b) and Certification Fed. R. Civ. P. 23.01(c):

223.    The Prerequisites of Fed. R. Civ. P. 23.01(a) having been satisfied. The Class may be Maintained  as the prosecution of separate actions by individual members of the classes would create a risk of inconsistent or varying adjudications that would establish incompatible standards of conduct and punishment for Defendants and/or because adjudications respecting individual members would, as a practical matter, be dispositive of the interests of the other members or would risk substantially impairing or impending their ability to prosecute their interests.

224.    The Class should be maintained and certified is appropriate because Defendants have acted or refused to act on grounds generally applicable to all members of the class, thereby making final injunctive relief or declaratory relief as a whole appropriate.   Plaintiffs and member of the class have suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct.

225.    The Class may be certified as a Class Action is superior to other available methods for the fair and efficient adjudication of the controversy.   Absent a Class Action, most, if not all members of the Class would likely find the cost of litigating their claims costly and beyond their means.   Therefore, the Class Members have no effective individual remedy at law.   The Class treatment of common questions of law or fact is also superior to multiple piece meal litigation in that it conserves the resources of the Courts and the litigants and promotes consistency and efficiency of adjudication.

**Appointment of Class Counsel Fed. Rule Civ. P. 23(g.):**

226.    Counsel of Record has served as the representative Plaintiffs in Kentucky state actions and in Federal Court.   Counsel of record could not possibly logistically represent the hundreds of putative class members who have contacted said counsel since 2008 to seek representation.

227.    An expert document expert has already been procured on behalf of the class.   Said expert is currently working with the Justice Department's criminal investigation, which parallels the allegations of this action.

228.    Counsel of record has been informally summoned by the Federal Bureau of Investigation and the Kentucky Department of Financial Institutions in an information and advisory position to the parallel criminal investigation.

229.    Counsel of record has served as an instructor for Continuing Legal Education in the state of California for the issues which are the subject of this action.

## VIII.   CAUSES OF ACTION
### COUNT I.

#### A.   Violation of 18 U.S.C. §1962 [c]
#### The Law Offices and the Document Processing Companies

230.    Plaintiffs re-alleges and affirms each and every preceding paragraph of this Complaint and incorporate such as if alleged anew.

231.    By engaging in a pattern of racketeering activity, specifically "mail or wire fraud," the Defendants subject to this Count participated in a criminal enterprise affecting interstate commerce.

232.    A separate count of Mail Fraud took place each and every time a fraudulent pleading, Affidavit, Promissory Note Assignment, mortgage or mortgage

assignment was sent by a Defendant through the use of the US mail.  Likewise is true for any documents sent via electronic mail as would be the case as part of a Federal action electronically filed with the Court.  Such would constitute a separate act of wire fraud.

233.    By sending the fraudulent affidavits, assignments and pleadings to the clerks of court, judges, attorneys, and defendants in foreclosure cases. These Defendants intentionally participated in a scheme to defraud others, including the Plaintiff and the other Class Members,  They utilized the U.S. Mail and the internet to do so.

234.    The criminal enterprise affects interstate commerce in numerous ways. It is used to conceal the true ownership of mortgage loans from the general public, including investors, borrowers, the SEC, the IRS and the Courts.

235.    But for the Conspiracy, investors would be enabled to have a clearer picture of the assets and debts of large banking and financial institutions in which they may consider investing.

236.    The entire American economy has been affected by the conspiracy described in this Complaint, which is exemplified by the MERS enterprise. The foreclosure crisis and larger economic downturn were substantially contributed to, and are believed

237.    to have been caused, by the MERS enterprise and underlying conspiracy as it related to the fraud involved with the securitization of mortgage loans and the issuance of unregulated derivative contracts.

238.    The "predicate acts" of fraud, which were accomplished through the U.S. Mail,  and the internet, and which are specifically attributable to the Defendants subject to this Count, are:

a.)  Bringing suit on behalf of entities which were not the real parties in interest, and

which had no standing to sue. This involved, and involves, the use of the MERS artifice.

b.)  Actively concealing the plaintiffs' lack of standing in their standard complaints

for foreclosure.

c.)  The drafting, by DOCX/LPS and LSR Processing of the fraudulent affidavits and

documents and the subsequent execution of the documents be robo-signers and

employees of the document company, servicer or Defendant Law Firm, and the filing of

fraudulent and forged affidavits as to loan ownership by robo-signers and employees of

the Defendant Law Firms, servicers and LPS and LSR Processing.

239.     The Defendant Law Firms attached to these fraudulent complaints the

mortgage containing the MERS provisions quoted above. While the title of the standard

complaint makes reference to "unavailable" loan documents,  the Defendant Law Firm

alleges that the plaintiff is the "owner and holder" of the note and mortgage."

240.     The documents on their face contradict this statement.   A forged

mortgage assignment is often attached as an Exhibit to a Motion for Default.   Other

times, the Default or Summary Judgment is granted based on the perjured affidavit of one

of the Conspirators employees while the mortgage is still in the name of MERS.

241.     Documents executed by an alleged MERS "Assistant Secretary" or

"Vice President,"

242.     By persons working for the foreclosing entity with no knowledge

whatsoever of the truth of their contents.

243.     These predicate acts are related. They share the common purpose of

defrauding the

244.    Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

245.    The predicate acts satisfy the RICO continuity requirement: they extend from in or

246.    Beginning in 1998 and continuing unabated, the scheme meets the definition of "open-ended" continuity. The threat of continued criminal activity as part of this enterprise in, without question, still looming over the American economy.6 Alternatively, closed-ended continuity is present because the scheme occurred over a period in excess of ten years.

247.    As the result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes. The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members by the Defendant Firm in the subject complaints to foreclose property and to enforce non-existent Loan Documents.   Since any real parties in interest have already been paid, the mortgages were truly not subject to being foreclosed upon, and the fair market value of the properties at the time of foreclosure is for this reason the measure of the damages suffered by the Class Members. To provide an example, if the average value of the properties was $250,000.00, and the Class is

---

6  Herein lies an alleged quote from David Stern, one of the attorneys under criminal investigation in the state of Florida:  "One of my favorite questions from one of my believers, one of my investors on the first call-in, "What inning are we in? If this was a baseball game, what inning are we in?" And my response is, we're only in the 2nd inning. We still have 3 innings of foreclosures left, and after the foreclosures, we have 3 innings of REO liquidation and as the REO liquidations pan out, we get into the re-fi and we get into the origination. [ . . . ]  So yeah, we're in the 2nd inning, but guess what - when we get to the 9th inning, it's going to be a doubleheader and we got a second game coming. So when people say, "Oh my God, the economy    is    bad!"    I'm    like,    "Oh    my    God,    it's    great."    See. Www.americansunitedforjustice.org/stern.html.

comprised of 10,000 persons, the initial damages to which the Class is entitled by law would be $2,500,000,000.00, or 2.5 billion dollars. This amount is then tripled by operation of the RICO law, so that, without reference to attorney fees and costs, the total damages awarded would be 7,500,000,000.00, or 7.5 billion dollars.

248.    The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived in the manner indicated in the preceding paragraph. plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c].

### B.   Violation of 18 U.S.C. §1962 [c]
### Defendant Merscorp, Inc. and Its Shareholders

249.    Plaintiffs re-alleges and affirms each and every preceding paragraph of this Complaint and incorporate such as if alleged anew.

250.    Merscorp, Inc. was created in or about 1998, and its purpose, from the outset, was to enact the fraudulent scheme/RICO enterprise herein complained.

251.    Its overt acts include the following: a.)  Creation of the MERS artifice; b.) Planning, designing, and enacting the MERS criminal enterprise of which Plaintiff complains herein; c.)  Arranging for the use of the MERS as "mortgagee" in the standard mortgages at issue; d.)   Drafting of the standard MERS language to be included in such mortgages; e.)   Entering into one or more "agreements for signing authority" which purported to allow employees of the  other conspirators to execute assignments in which the "assignor" and "assignee" are strawmen actually not possessed of the capacity stated, and of which the person executing the document has no knowledge; f.)   Creation and maintenance of an acceptable public image for MERS; g.)  Owning and maintaining the registration and licensure of the MERS entity, Mortgage Electronic Registration Systems,