Inc, with the necessary state agencies, plus other ministerial acts designed to maintain the corporate shield and to mimic the actions expected of normal corporations so as to fraudulently disguise its true nature, and; h.) Facilitating the use of the MERS artifice by other participants in the conspirators' scheme.

252.      These predicate acts are related. They share a common purpose, defrauding the Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

253.      The predicate acts satisfy the RICO continuity requirement: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants in the RICO enterprise engaged in a pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "closed-ended" continuity.

254.      As the result of the RICO enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes. The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members in the subject Complaints to Foreclose on the class members property. The real parties in interest to the loan have already been paid. The MERS mortgages were and are not enforceable. The mortgage loans possessed by the Plaintiffs and putative class were not subject to being foreclosed upon, and the mortgage amount recorded in the pubic record of the properties is the measure of the damages

suffered by the Class Members in relation to MERS. The manner in which damages should be calculated is set forth in Count I.A. and is incorporated here by reference.

255.     The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived at using the formula set forth in said paragraph, plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c].

### C.   Violation of 18 U.S.C. §1962[d].
### All Named Defendants Now and in the Future

256.     Plaintiffs re-allege and affirm each and every preceding paragraph of this Complaint and incorporate such as if alleged anew.

257.     The Defendants have conspired together to violate 18 U.S.C. §1962[d], by committing fraud and utilizing the US Mail and the internet.   The Defendants agreed upon the same criminal objective to wit:   the theft of real property through illegal foreclosures.   Each conspirator is reasonable for the actions of the others and the results of the conspiracy as a whole.

258.     Those who provide support for an illegal enterprise are liable for the actions of those who commit the criminal acts, regardless of whether they participated in that particular criminal act.

259.     Additionally, each and every shareholder in MERS shall so too be responsible for the acts of the other players to the conspiracy.

260.     The class members are entitled to judgment in the amount of three times their actual damages, plus costs and attorneys' fees under 18 U.S.C. §1964[c].

### COUNT II.
### Conspiracy and KRS 506.040

261.     Plaintiff incorporates by this reference each and every paragraph of

this Complaint as if set forth fully herein.

## Introduction of the Claim:

262.    At all times relevant hereto, agreements were made by and between the original Lender the foreclosure Plaintiff and MERS to deceive the Homeowners; and to break Kentucky and Federal law. The entities colluded together to achieve unlawful aims by unlawful means. The entities, as co-conspirators, took overt steps to accomplish their illegal acts and have clearly demonstrated their intention to break the law; thereby "breathing together" in their fraudulent and illegal acts.

263.    The Plaintiff and MERS' conduct constitutes a pattern of corrupt activity. They have maintained more than two and perhaps thousands of foreclosures in Kentucky under the fraudulent and misleading circumstances as fully outlined in this Claim.

264.    Through the filing of foreclosure under false pretenses and the filing of a Post-Foreclosure fraudulent and forged Mortgage Assignment, in violation of Kentucky and Federal law, the Plaintiff with the assistance of its co-conspirators, the original Lender, MERS KRS 506.040. Thousands of other Kentucky homeowners have been injured through the improper loss of title to their property, loss of the equity in their property, through penalties, court costs and attorneys fees charged against their accounts on lawsuits filed under false and misleading circumstances, and from other incidental and consequential costs and expenses attendant to being disposed of the property illegally.

265.    Defendant MERS, the wholly owned subsidiary of Merscorp, Inc., is an unregistered entity created in or about 1998 by conspirators from the largest banks in the United States in order to undermine and eventually eviscerate long-standing

principles of real property law, such as the requirement that any person or entity who seeks to foreclose upon a parcel of real property: 1) be in possession of the original note and mortgage and 2) possess a written assignment giving he, she or it actual rights to the payments due from the borrower pursuant to the mortgage and note.   Merscorp, Inc., claims to be the sole shareholder in an entity by the name of Mortgage Electronic Registrations Systems, Inc.,

266.    MERS is the enterprise and is the primary innovation through which the

267.    conspirators, including the Defendants, have accomplished their illegal objectives as detailed throughout this Complaint.

268.    In and about the years 1998 and 1999, the mortgage industry introduced new "products" into the American marketplace, known as Mortgage Backed Securities ("MBS".) These products included "non-documentation loans" and adjustable rate mortgages, known as "ARMS." Mortgage lenders, acting in coordination with one another, relaxed their standards for lending, which made an entirely new class of lower-income individuals eligible to receive loans. This, in turn, drove up property "values." As part and parcel of this scheme, banks and other lenders "accepted" appraisals "documenting" the new, higher values, and approved hundreds of thousands of applications for financing, most of which would normally have been declined.

269.    Unbeknownst to the borrowers and the public, the billions of dollars spent to fund these loans were expended to "prime the pump." The big institutions and the conspirators were making an investment, but the expected return was NOT the interest they pretended to anticipate receiving as borrowers paid the mortgages. The lenders knew that the new loans were "bad paper;" this was of little concern to them

because they intended to realize profits so great as to render such interest, even if it had been received, negligible by comparison. Part of the reason this fraudulent scheme has gone largely unnoticed for such an extended period of time is that its sophistication is beyond the imagination of average persons. Similarly beyond the imagination of most persons is and was the scope of the dishonesty of the lenders the investment banks and the principal owners of MERS and those acting in furtherance of the scheme, including the present Defendants.

270. Through the present time, persons acting within the ambit of this conspiracy, most particularly including the Defendants herein, have continued to operate consistent with the core principles of dishonesty and obscurantism engendered by the original conspirators.

271. These dark influences have spread throughout the financial services, lending and banking industries into the national economy and beyond, threatening the economic stability of the United States and the world as a whole. This Court is urged in the strongest possible way to apply a presumption of falsity when reviewing any documentary evidence filed in this Court by one or more of the Defendants. Such a presumption is not just warranted; it is indeed compelled by the extent to which the Defendants and those with which they are associated have long acted in a malicious and wanton manner evincing complete contempt for the judicial process and the rights of persons having interests contrary to their own. This is particularly true because the Defendants' contempt for due process is compounded by their specific intention to obviate the requirement that documents prepared for legal use be truthful, authentic, and legitimate.

272.    There is one sort of lie that, when later discovered, constitutes the strongest possible proof of a person's malicious intentions. What is it? A lie about one's name or identity.

273.    Many such lies are present in this instance. The whole purpose of MERS is to allow "servicers" to pretend as if they are someone else: the "owners" of the mortgage, or the real parties in interest. In fact they are not. The standard MERS held mortgage Complaint contains a lie about this very subject. While the title of the standard complaint makes reference to "loan documents," in the body of the standard complaint, the Defendant Firm alleges that the plaintiff is the "owner and holder" of the note and mortgage. Both cannot be true unless the words used are given new legal meanings.

274.    In the years leading up to the introduction of the new loan "products," the conspirators laid the groundwork which would grow into a new mortgage lending infrastructure: a new paradigm in which the ratios of risk to reward were dramatically altered in favor of these conspirators.    To date, no individual players have yet to be convicted of their felonious acts and imprisoned.[7]

### The Use of the term "nominee" :

275.    On many mortgages, MERS call itself the "nominee" for the lender listed on the Promissory Note.   However, this allows for another "nominee;" one which could apparently coexist with MERS.

276.    When the Note has been table funded, meaning the lender on the Note never lent any money and therefore never had any rights in the Note, MERS has become

---

7 Upon information and belief, there are multiple ongoing criminal investigations in the state of Florida, New York and here in Kentucky by the Justice Department.

the "nominee" for an entity with absolutely no pecuniary interest in the Note from the moment of Note's execution.

277.    The Mortgage states that MERS "is" the nominee for the lender.  "Is" is present tense - - this seems to indicate that as of the time of execution of the mortgage, MERS was performing some unknown service for both lender and its "successors and assigns" even though ostensibly the mortgage had not as of execution been assigned. Upon assignment, it would seem to be impossible for MERS to act as "nominee" for the original lender. This phrase also tacitly acknowledges that the mortgage will be assigned.

278.    A "mortgagee" is the person or business making a loan that is secured by the real property of the person (mortgagor) who owes him/her/it money.

279.    In order to further the goals of the conspiracy, and to perpetuate this new paradigm was the inclusion in new mortgages of intentionally ambiguous and infinitely malleable provisions pertaining to MERS. As is the case with most of the written documents

280.    As routinely used in the scheme, with mortgage assignments and complaints for foreclosure, each word concerning MERS in these standardized mortgages is carefully crafted so as to allow those relying upon it to infinitely recede in their positions and to be moving targets virtually unreachable by standard legal means.

281.    The standard mortgage is a form entitled "KENTUCKY-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT-MERS," or some slight variation thereof. Upon reading the standard mortgage clauses pertaining to MERS, even persons of high intelligence will have a sense that they should, but do not quite, comprehend them.

### The false "Transfer" of Rights in the Property:

282.    This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants.    There is no "purpose" stated in the preceding sentence.

283.    How can the borrower simultaneously "convey" the property to: (1) MERS as nominee

284.    for lender; (2) MERS as nominee for lender's successors and assigns; and (3) MERS's *own* successors and assigns? Furthermore, who *are* such successors and assigns? No assignment could have existed as of the moment the mortgage was executed by the borrowers, and if somehow same did exist, it should have been disclosed as a fundamental and material aspect of the transaction. If the assignment occurred prior to the mortgage, the mortgage itself is void because the lender had no interest to secure.

285.    A mortgage is **not** a conveyance of property by operation of Kentucky law.

286.    What "interests" does this passage refer to, and to *whom* were they granted?   No "law or custom" could possibly necessitate action by MERS, as opposed to action by the original lender.

287.    Before the ink on the new mortgages was dry, and before the loan would be considered "dry" by industry standards; while the loan was still "wet" and in many cases non-existent legally, the lenders promptly sold the loans, in secretive transactions, to "investors" for some percentage or fraction of what had been the alleged value of the mortgage and the property by which it was secured just days or weeks

earlier.   In some cases, the loan was listed inside a MBS and sold before the loan was even consummated.   Most were sold without the Note ever being in the possession of the MBS.   All loans, for purposes of this action, were securitized and sold with the mortgage recorded in the name of MERS    The unsuspecting investors were in fact buying nothing.8

288.    The quick sale by the lender of its interest, at what appears to be a loss, would have at first seemed inexplicable, but when considered with the benefit of hindsight, proof of these quick transfers would have been evidence that the lender knew in advance that property values would soon decline.    Additionally, the securitizers/underwriters, hedged their bets beforehand with multiple collateral contracts, far in excess of their original investment, thereby banking on and benefiting on the fact that the MBS would eventually fail.

### Concealed Identity:

289.    By changing "servicers" on these loans, and by sending out notices of such changes drafted also in intentionally ambiguous verbiage, the bankers behind the scenes cooperated in obscuring the truth as to who had the right to receive the proceeds of the loans, and to foreclose in the event of non-payment. The loans were grouped into "pools" and sold multiple times, thereby increasing profits for the wrongdoers. These "securitized debt pools" were sold on the stock market and elsewhere, and in this manner affected interstate commerce. The real parties in interest also in many instances collected mortgage insurance upon "default."

---

8 A review of the Pacer record reveals that the duped investors have begun en mass to also file their own class actions against the entities which sold them the phony securities.

290.     Another part of the scheme was the use of words in ways inconsistent with their traditional meanings, and the creation of new terms which could be used to blur important distinctions between parties and their interests. The revolutionary ways in which words were utilized all shared one characteristic: they made it more difficult to determine who had the right to receive and utilize for their own purposes the payments made on the loan by the borrower. For example, "mortgagee" began to have a meaning other than "lender." "Servicer" arose to prominence and was and is used to further obscure important truths. Specifically, the "servicer" does not hold the true beneficial interest in the mortgage.

291.     Typically, the Defendants will not release any further information on the subject, whether it is requested in discovery in a foreclosure action or in any other context.

292.     With the oversight of Defendant MERS/Merscorp and its yet to be named unknown principals, the MERS artifice and enterprise evolved into an "ultra-fictitious" entity.   To perpetuate the scheme, MERS was and is used in a way so that to the average consumer, or even legal professional, can never determine who or what was or is ultimately receiving the benefits of any mortgage payments. The conspirators set about to confuse everyone as to who owned what. They created a truly effective smokescreen which has left the public and most of the judiciary operating "in the dark" through the present time.

293.     Although the putative class of this Class Action does not include every American citizen, it can be concluded that reasoned contemplation of the available facts leads to a stunning realization: the mortgage crisis and resulting economic downturn with

which the United States is currently afflicted was planned in advance by certain scions of Wall Street.

294.    In addition to the other incriminating facts set forth in this Complaint the Judge and Jury in this case may also consider this: On its website, www.mersinc.org, Defendant MERS/Merscorp lists the shareholders of "MERS," which is defined on a separate page of the site as "Mortgage Electronic Registration Systems, Inc." Among the shareholders of MERS, according to the site, are the following institutions: Bank of America, Chase, CitiMortgage, Inc., Fannie Mae, Freddie Mac, HSBC, SunTrust, and Wells Fargo. These are many of the same institutions the law firm in this action represents. This is no coincidence, as these entities are co-conspirators in the MERS scheme herein described.9

295.    The conspirators intended to maintain an absolute stranglehold on the American economy for many decades, if not centuries, into the future. This could only be accomplished if the scheme was able to evolve over time in a changing regulatory and consumer environment. The point is that the conspirators adjusted the American lending system and the legal system governing it in a way designed to most effectively gratify their greed motivated crimes over the longest period of time.

296.    Through this revolution in the use of words and ephemeral concepts such as the "corporation," the conspirators, including the present Defendants, have by-and-large been successful in changing the paradigm so that the rights of individuals are

---

9    In contradiction with the ownership proclamation contained on www.mersinc.com and as previously addressed, the parties make the representation that MERS is owned entirely by Merscorp, Inc. However, the owners of MERS will be named officially to this action upon the receipt of the information through verified discovery.

no longer afforded the safeguards which have been carefully maintained in place since the colonies became a nation.

297.    As the conspirators and present Defendants have long intended, certain important terms in the mortgages and other legal documents are devolving into a state of meaninglessness.   Even the names of the mortgage and lending institutions are tinkered with and interchanged so often that it is difficult to keep track of the constantly shifting parameters of the series of alleged mergers, assertions of subsidiary relationships, "divisions," and the like with which the American economy and consumer populace are deluged in advertisements and mortgage documents. This is not some random trend which resulted from the mortgage crisis. It is, instead, just another tactic in the vast scheme which ultimately caused it. The end result of the continued actions is that the mortgages and associated documents come to mean whatever their proponents wish them to mean.

298.    The conspirators of course did not want there to be any documentation which could incriminate them or later potentially be used as evidence of their crimes and evidence to the investors of the MBS or the IRS that the loans were illegitimate.

299.    They did not want to pay the fees associated with recording mortgages and they did not want to be bothered with the trouble of keeping track of the originals. That is the significance of the word 'Electronic' in Mortgage Electronic Registration Systems, Inc. The conspirators, through this exceptionally sophisticated legerdemain, made over the American judicial system's long-honored requirements for mortgages and foreclosures to serve their own criminal interests and to minimize the possibilities of the victims obtaining any meaningful redress through the courts. They undermined long-

established rights and sabotaged the judicial process itself by de-emphasizing the importance of, and eventually eliminating, "troublesome" documentation requirements. If a conversion to electronic loan documentation is ever implemented, it is the PEOPLE, by and through their elected representatives, who could ultimately bring about this transition through duly enacted Kentucky state legislation.   Most importantly, these changes are to be made BY THE STATES themselves, and not a system implemented nationwide by any Federal body.

300.    The preparation and filing of MERS mortgages and assignments, and prosecution of the complaints to Foreclose on the MERS mortgages on these properties were each predicate acts in the pattern of racketeering activity complained of herein, and were actions taken in furtherance of the MERS enterprise. The actions could not have been brought by the Defendant Firm without the MERS artifice and the ability to generate any necessary "assignment" which flowed from it. Just like MERS, the assignments were meaningless shells designed to pull the wool over the eyes of the judiciary and ease the burden upon the unknown real parties in interest. The practice of "non-documentation" can be seen as a common thread weaving all of the complained-of conduct into an undeniable tapestry of a criminal enterprise proscribed the Kentucky statute.

## COUNT III.
### KRS  434.155 Filing Illegal Liens

301.    Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

302.    A person is guilty of filing an illegal lien when he files a document or lien that he knows or should have known was forged, groundless, contained a material misstatement, or was a false claim.

303.    Filing an illegal lien is a Class D felony for the first offense, a Class C felony for any second offense, and a Class B felony for any subsequent offense.

304.    The Defendants filed an illegal lien in the way of an Assignment of Mortgage against the Plaintiffs' and Class Members property.

305.    Since 2007, the Defendants have filed thousands of forged, groundless, materially misstated or false claims against the Class Members property in the way of illegal Assignments of Mortgages.   From the third offense forward, each and every illegal lien filed constitutes a Class B Felony.   The individuals responsible for the violations, can be ascertained from the public record for criminal prosecution.   Restitution to the Plaintiffs and to the Class Members is warranted.

306.    All parties taking part in or who conspired with those who participated in the acts or practices in question are jointly and severally liable to the Class Members.

## COUNT IV.
## Common Law Fraud and Injurious Falsehood

307.    Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

### Fraud:

308.    Fraud occurs generally where there is an intentional <u>deception</u> made for personal gain or to damage another.   For a civil verses a criminal claim under Kentucky law, there are six elements: 1) a "material misrepresentation;" 2) "which is false;" 3) which Defendant knew "to be false or made recklessly;" 4) which was made in order to

induce Plaintiff to act in a certain manner; 5) that Plaintiff so acted in reliance on the misrepresentation; and, 6) that Plaintiff was injured as a result of this reliance.   Common law fraud may be proved in Kentucky based solely on circumstantial evidence.

309.      The forged and publicly filed "false" mortgage assignments are the key element to the Defendants being able to perpetrate the fraudulent foreclosures.   The Defendants conspired together and "knew" the "material representations were "false." The material representations to the Court and to the property owners was made so that the Court and the property owners would believe that the Defendants had legitimate claims in the property.   The property owners and Judges across Kentucky  relied on such and the property owners were injured as a result with the entering of a judgment or the facing of foreclosure litigation.   There could possibly be no more serious injury to a Kentuckian than the illegal divestment of his private property.

### Injurious Falsehood:

310.      One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.

311.      The Mortgage Asignments were published false statements intended to do harm in which the Defendants clearly recognized would divest the pproperty owner to title. The Defendants knew the foreclosures and declaratory judgments were filed with false statements as to the Defendants' standing to file suit and status as Mortgagee.   The Defendants are subject to liability for the pecuniary loss by the property owners.   The

pecuniary loss to the Property owners under injurious falsehood is the fair market value of

the property and costs associated thereto.

**Count V.**
**Slander/Defamation of Title and Quiet Title KRS 411.120**

312.    Plaintiffs incorporate each and every paragraph of this Complaint as if

fully set forth in this claim.

313.    KRS 411.120 states:

> Any person having both the legal title and possession of land may prosecute suit, by petition in equity, in the circuit court of the county where the land or some part of it lies, against any other person setting up a claim to it. If the plaintiff establishes his title to the land the court shall order the defendant to release his claim to it and to pay the plaintiff his costs, unless the defendant by his answer disclaims all title to the land and offers to give such release to the plaintiff, in which case the plaintiff shall pay the defendant's costs, unless for special reasons the court decrees otherwise respecting the costs.

314.    Based on this Petition in Equity, the property owners are entitled to have clear title

restored and the Court should Order the Clerks of the Counties to release all mortgages and strike all

mortgage assignments filed in the name of the Defendants as to the Class Members.

**Slander of Title:**

315.    The Defendants have knowingly and maliciously communicated, in writing, a

false statement which has the effect of disparaging the plaintiff's title to property.   The proeprty

owners have incurred special damage as a result.

316.    MERS was illegally and fraudulently listed in the public record as a

Mortgagee, having no pecuniary interest in said property and no standing to ever collect

upon or enforce a debt connected to the property.   The Post-Foreclosure Mortgage

Assignment  was drafted by a partner at the law firm filing this action. The Assignment

was signed by an employee of that law firm and her signature notarized by an employee

91

of the law firm.    The Post-Foreclosure Assignments from MERS to the Plaintiff are a legal nullity and if placed in the public record, were based in fraud and subject to prosecution.

317.    MERS has no legally enforceable claim, interest or standing to sue as to the Note or Mortgage in question and the claim is a cloud on the Defendants' title and should be quieted as against MERS under Kentucky law.

318.    Plaintiffs are the rightful owner of the properties known as each have stated herein above.

319.    The Plaintiffs are the legal title holder of their respective properties.

320.    MERS has caused to be recorded against the title of the Plaintiffs' properties and sent notices of default, filed foreclosures and served and filed mortgage documents that claim an interest in the properties of the Plaintiffs.

321.    As alleged herein, any purported transfer of any interest in the Plaintiff's d real estate was wrongful and invalid because the mortgages, foreclosures or purported foreclosures were invalid and were not conducted in accordance with the laws of Kentucky.   MERS knew or should have known that such transfers were wrongful and invalid.   Any publication of an ownership interest in any of the Plaintiff's properties is, therefore false.

322.    The recording of the mortgages published the information to third parties.

323.    As a result of said wrongful publication of an ownership interest in the Plaintiff's properties, Plaintiffs have incurred damages in excess of the amount of their

individual publicly recorded mortgages and will continue to incur attorneys' fees and costs related to this litigation, in an amount to be proven at trial.

**(Declaratory Relief)**

324.    As alleged in Plaintiff's claims regarding Defendants' wrongful filing of mortgages, foreclosure, unjust enrichment and conspiracy, Plaintiff's rights have been violated.

325.    Defendants have filed mortgages, threatened foreclosure or have foreclosed against Plaintiffs for which Defendants are not owed any payments, have no lawful right to foreclose and have unlawfully deprived or attempted to deprive Plaintiff of their home and further have failed to notify the Plaintiffs of the discharge of their obligations on the notes associated with their mortgage.

326.    Plaintiffs seek a declaratory judgment against Defendants stating that Defendants have violated Plaintiff's rights and that the Defendants had and have no right to hold mortgages in the name of MERS and/or foreclose on the Plaintiffs' property and that the Defendants are entitled to no further payments from the Plaintiffs or recognition in Plaintiffs' Title to their property.

**(Reformation)**

327.    Plaintiffs have been intentionally misled about the terms and conditions of the agreements entered into with the Defendants, MERS and all other yet to be named lenders, who originated loans or who have attempted or have successfully foreclosed on the Plaintiffs.

328.    The Plaintiffs are entitled to a reformation of these agreements and notes as unsecured notes or as partially or wholly discharged notes and a right to

reformation of the contracts with the persons or entities who are owed obligations because of funding of the loans of the Plaintiffs.

**(Quiet Title)**

329.     The Plaintiffs are entitled to have their properties as referred to herein quieted in their names until and unless some party comes forward in this litigation who has a right to enforce the loans upon their houses free and clear of all encumbrances.

330.     As alleged in the above paragraphs, the loans on these home were specifically designed to result in equity stripping by loaning funds at the same time to these Plaintiffs as to other borrowers that were intended to fail.

331.     The originators of the loans were brokers of loans and intended to place the loans but to never be the "lenders" that they purported to be.

332.     The originators of the loans, were, in fact, a means by which MERS and the Defendants could insulate themselves from liability for the breach of contract, the violation of lending and recording laws, and for all the reasons stated in the allegations of this Complaint.

333.     The Defendants have not loaned any money to the Plaintiffs.

334.     The Defendants have no contractual relationship with the Plaintiffs.

335.     The Defendants are not the holders in due course of the promissory notes on the Plaintiff's properties.

336.     No one who has an interest in the Plaintiff's properties has made any claim of that interest.

337.     The Plaintiffs are entitled to have the titles to the properties quieted in their names as to the Defendants, where a mortgage was ever recorded in the name of

94

MERS.

338.    Plaintiffs have been required to retain counsel in this matter to protect their rights and seek these remedies and have incurred attorneys' fees and costs in this matter.

### Count VI.
### Fraud by Misrepresentation

339.    Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

340.    The deceptive acts of the the original Lender(s), and MERS as to the inducement of the borrower to enter the transaction and as to a multitude of misrepresentations in the execution of such; including, but not limited to the true identity of the Lender and fraudulent misrepresentation as to the Mortgagee, MERS. The record shows, by clear and convincing evidence, that there existed in the inducement and execution, material representations which were false, were known to be false or made recklessly, which were made with inducement to be acted upon; that the Defendants acted in reliance thereon and has suffered injury due to such.   The facts as attested herein, and the documentary evidence shows that the deceptive acts of the Lender, the Plaintiff and MERS constitute fraudulent misrepresentation and the parties in question are jointly and severally liable for their acts of fraud by their misrepresentation and all damages stemming from such, including punitive damages and attorney's fees.

### Count VII.
### Fraud by Omission and Inducement

341.    Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

342.     The Lender conspired to fraudulently conceal the "True Lender" at closing, and the  Note may have been securitized and converted into an investment vehicle within a Special Purpose Vehicle.   The Lender, the Plaintiff and MERS had a duty to disclose material facts, failed to disclose those facts; and that failure induced the Defendants to act, and they have suffered actual damages due to the fraudulent omissions.   The parties had a duty to disclose the true nature of their relationship and the fact that the Lender was merely a "Pretender Lender" and thus, the agent for the Concealed and Unknown Lender.       The failure to disclose the material facts, induced the Defendants to enter into a loan with unknown and unrevealed entities and he has suffered actual damages as a direct result of Fraud by Omission.   The plaintiff and MERS are jointly and severally liable for their acts of Fraud by Omission and all damages stemming from such.

## COUNT VIII.
## Conspiracy to Commit Fraud by the Creation, Operation and Use of MERS System

343.     Plaintiff incorporates by this reference and re-alleges the allegations contained in all the paragraphs above as if set forth fully herein.

344.     Upon information and belief, Defendants and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in  fraudulent and predatory lending practices perpetrated on Plaintiff as alleged herein and the actions of the Defendant conspirators were taken as part of the business policies and practices of each Defendant conspirator in participating in the MERS system.

345.     Upon information and belief, the Defendant conspirators are or have

been members of and participants in the MERS system, and, through their employees and agents, served as members of MERSCORP, Inc. and/or MERS, Inc., and participated in the design and coordination of the MERS system described in this complaint.

346.    Defendants' participation as shareholders, directors, operators, or members of MERSCORP, Inc. and/or MERS, Inc. are as follows:

347.    MERSCORP, Inc. is the operating company that owns and operates the MERS System described herein, and is the parent company of Mortgage Electronic Registration Systems, Inc. ("MERS, Inc.").

348.    Defendants are shareholders, members or representatives of MERS, Inc.

349.    Whenever this Complaint refers to any corporation's act, deed, or transaction, it means that such corporation engaged in the act, deed, or transaction by or through its members, officers, directors, agents, employees, or other representatives while they actively were engaged in the management, direction, control, or transaction of its business or affairs.

350.    Beginning at a time unknown to the Plaintiffs, prior to 2004, and continuing through at least the present, the Defendant co-conspirators engaged in a conspiracy to unlawfully deprive borrower-homeowners of property in numerous States through issuing predatory loans as described herein, and through securitization and subsequent processes described herein.

351.    MERS, Inc. and/or MERSCORP, Inc. arranged for bilateral and multilateral meetings, bilateral and multilateral teleconferences, and bilateral internet communications with potential Shareholders, actual Shareholders, candidates for

Membership, and Members.

352.    Upon information and belief, the Defendant conspirators have conspired among themselves and with other unknown parties to:

a.  Develop a system of earning profits from the origination and securitization of residential loans without regard for the rights of Plaintiffs, and others similarly situated, by engaging in predatory and deceptive residential lending practices as alleged in this complaint above; and

b.  In furtherance of the system referred to immediately above, the Defendant conspirators intentionally created, managed, operated and controlled the Defendants MERSCORP, Inc. and MERS, Inc. for    the specific purpose of MERS, Inc. being designated as a sham "beneficiary" in the original deeds of trust securing those loans, including the loans made to Plaintiffs and other similarly situated individuals by the "lenders"; and

c.  Defendant conspirators intentionally created, managed, operated and controlled the MERS system with the unlawful intent and for    the unlawful purpose of making it difficult or impossible for Plaintiffs and other victims of such industry-wide predatory policies and practices to identify and hold responsible the persons and entities responsible for the unlawful actions of Defendants and their co-conspirators because MERS did not track the transfers but relied upon the members to report the transfers when a foreclosure was initiated.

353.    Upon information and belief, Defendant conspirators, through creation of the MERS system alleged herein, adopted and implemented residential lending underwriting guidelines for use in Kentucky and in other states which:

98

a. were intended to, and did, generate unprecedented profits for the Defendant conspirators and their co-conspirators at the expense of Plaintiff and other persons who were fraudulently induced by the Defendant conspirators and their co-conspirators into taking out residential loans that were known by the Defendant conspirators and their co-conspirators, at the time the loans were originated, and,

b. were likely to result in foreclosure on those loans and loss by Plaintiff and other borrowers of their home, with reckless disregard and intentional indifference by the Defendant conspirators and their co-conspirators of the likelihood of such foreclosure.

354. Removing the transfers from the recording process and failure to record a real estate transaction on the public record maintained by the county clerks prevents oversight of real estate transactions by the public and by public officials.

355. MERSCORP, Inc. informed its co-conspirators that using the MERS system would remove transaction records from the public record.

356. MERSCORP, Inc. and/or MERS, Inc. have publicly stated the following:

357. "MERS eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans."

a. "With the recording of the security instrument(s), MERS becomes the mortgagee in the county land records and no assignments are required during a subsequent sale and transfer of the loan between MERS members."

b. "There is no dependency on the corporate name you use on closing documents and the corresponding corporate name on the MERS System because the MERS System is not the legal system of record of ownership of mortgage loans."