358.    Upon information and belief, the MERS system was created for the unlawful purpose of hiding and insulating the brokers and originators of predatory toxic loans from accountability and liability by creating an entity which simultaneously informed all lenders who originated loans that named MERS as the beneficiary of the following:

359.    MERS would never own or acquire any actual beneficial interest in any loan in which it was named as beneficiary under the deed of trust, and that

360.    MERS could be named as beneficiary for purposes of public notice and notice to the borrower and would act in that capacity if so designated by the lender who originated the loan.

361.    Upon information and belief, the intent and purpose of the Defendant conspirators and their co-conspirators in the creation, management, operation and control of MERS was, without limitation, to make it impossible for the borrowers, their attorneys, the courts, the government, and anyone other than the Defendant conspirators who created and controlled MERS to identify the actual beneficial owner of any particular loan or the property which was the collateral securing that loan until such time, if any, that foreclosure action was initiated.    As a result, Plaintiffs were deprived of the right to modify their toxic loan even though the Defendant America's Servicing Company did not provide the right to modify the loan and the true beneficial owners were intentionally hidden from Plaintiffs and the transfers that occurred of the note of the Plaintiff have also been hidden from them.

362.    MERSCORP, Inc.'s marketing materials also promise Members with assistance with foreclosures.  MERSCORP, Inc. and/or MERS, Inc. have publicly stated:

100

"MERS has assembled a Foreclosure Manual to provide a state-by-state guideline for our Members to follow when foreclosing a mortgage loan in the name of MERS."

363.     Upon information and belief, the Defendant conspirators' actions in creating the MERS system, which was dependent on fraudulent and deceptive practices that included, but were not limited to, making loans to consumers such as Plaintiff using underwriting guidelines that were wildly divergent from the guidelines that had been used to give loans in this country for decades, created a system to unlawfully deprive Plaintiffs of their interest in their home and loaned money to the Plaintiffs for these home with the intention of foreclosing.

364.     MERSCORP, Inc. and/or MERS, Inc. offered Members increased profit. MERSCORP, Inc. has publicly stated:

a.   "The MERS web site enables you to target directly your MERS® Ready products and services to MERS members."

b.   "Commercial originators and issuers save hundreds to thousands of dollars (in the case of cross-collateralized loans) in preparing and recording assignments. Where the originator has not recorded a MERS as Original Mortgagee (MOM) security instrument, the issuer saves the costs of assigning to the Trust by having the originator assign to MERS."

c.   "It will reduce risk and generate more profits for lenders because the Notes registered on it will be in electronic format. It shortens the timeframe between the closing and the securitization of the loan, enabling the Note to move instantly, creating faster funding."

365.     MERSCORP, Inc.'s rules and by-laws, to which MERS Members

agree, require the following:

366.    BY COMPLETING, SIGNING, AND SUBMITTING THIS APPLICATION, THE APPLICANT IS AGREEING TO BE A MERS MEMBER. THE APPLICANT HEREBY AGREES TO PAY ALL FEES AND EXPENSES SET FORTH IN THE MERS RESIDENTIAL FEE SCHEDULE, WHICH MAY CHANGE FROM TIME TO TIME; ABIDE BY ALL EXISTING MERS RULES AND PROCEDURES, WHICH ARE INCORPORATED HEREIN BY REFERENCE AND MAY BE AMENDED FROM TIME TO TIME; AND COMPLY WITH THE TERMS AND CONDITIONS SET FORTH IN THE ATTACHED ADDENDUM ENTITLED TERMS AND CONDITIONS. (Emphasis in original).

367.    The MERSCORP, Inc. rules and by-laws, to which MERS Members agree, cannot be carried out lawfully because they require the following:

a.    MERS, which shall include MERSCORP, Inc. and Mortgage Electronic Registration Systems, Inc., and the Member shall abide by these Terms and Conditions, the Rules and Procedures (collectively, the "Governing Documents"), copies of which will be supplied upon request. The Governing Documents shall be a part of the terms and conditions of every transaction that the Member may make or have with MERS or the MERS® System either directly or through a third party. The Member shall be bound by any amendment to any of the Governing Documents.

b.    The Member, at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a

nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law. . . .

MERS and the Member agree that: (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans, (ii) transfers of servicing interests reflected on the MERS® System are subject to the consent of the beneficial owner of the mortgage loans, and (iii) membership in MERS or use of the MERS® System shall not modify or supersede any agreement between or among the Members having interests in mortgage loans registered on the MERS® System."

368.    The times, dates, and locations of the various meetings and communications among and between the conspirators are solely within the knowledge of the conspirators and have not been made public by MERS or its co-conspirators.

369.    In addition to the allegations made related to the director, and creator and user conspirators, the MERS system conspiracy consisted of:

370.    The Lender conspirators, including the entities who were named on the deed of trust as lender, Soma Financial, Inc., who agreed to procure loans by means of violation of state laws, as further described in the previous claims for relief, and the Trustees, Western Title Company, who allowed their names to be used as Trustee for

"lender" who did not lend any money and the beneficiary MERS who disclaimed to have any beneficial interest;

371.     MERS, the Lender, Securitizer and Servicer conspirators, who agreed to use the MERS system unlawfully and in violation of state laws to deceive homeowners and securities purchasers by misleading them to believe that the conspirators had legal authority to foreclose when, in fact, the conspirators do not have legal authority to foreclose on loans which were made part of the MERS system, as further described in the previous claims for relief.

372.     The Securitizer conspirator(s), who were aware of these violations of law during procurement and agreed to purchase the loans knowing that the law had been violated.

373.     The Securitizer conspirator(s) who, upon information and belief, packaged and sold loans knowing that such loans were based on deeds of trust that had been split from the notes, and based on loans that had been sold as part of the securitization process before the loans were finalized with the borrowers.  Thereafter, the purported interests in the obligations, the notes as evidence of the obligations, and the security interest for the obligations were transferred multiple times without recording the change in ownership of an interest in real property in the appropriate county records. This was accomplished by the creation of the private parallel record keeping service known as the MERS system, whereby MERS, Inc. is named in the deed of trust which is supposed to be the security for the underlying loan obligation.  MERS is named as the nominee of the lender, but not as the holder of the note or the actual lender.  Rather,

MERS is named as beneficiary for the purpose of deceiving the borrower and the clerk's office where the deed of trust is recorded.

374.    A securitization process that was based on loans that were made based on residential loan underwriting guidelines that were designed to generate as many loans as possible to fuel the securitization process to feed the demand for mortgage-backed securities, the faulty and toxic nature of which loans was hidden by the MERS system. As a result of MERS being named the beneficiary, and through the processes described herein, the note and deed of trust are "split."  When the note is split from the deed of trust, then the note becomes unsecured and a person holding only the note lacks the power to foreclose and a person holding only a deed of trust suffers no default because only the holder of the note is entitled to payment on it.  The monetary effect of utilizing the MERS system, in addition to the allegations set forth otherwise herein, was to hide profits and fees that were not disclosed to the borrower or to the investor in the note, which, in some cases, upon information and belief, were in excess of the principal value stated on the note.

375.    The Securitizer conspirator(s) who violated state and Federal securities laws through their descriptions of the financial derivatives created by the conspiracy demonstrated their fraudulent intent by their pattern of business practices;

376.    The Lender conspirators who agreed to supply borrowers to the Securitizers despite knowledge that the Securitizers would sell the borrowers' promissory notes in violation of the law.

377.     The Servicer conspirator who agreed to unlawfully foreclose on loans despite the separation of the loan from the deed of trust which made the foreclosure unlawful because the debt was no longer secured.

378.     All of the conspirators agreed to the participation of the other conspirators in their individual roles in the conspiracy. The loan files of each of the loans disclose the legal violations and document that the Lenders agreed to purchase loans from third party originators and to sell them to the Securitizers. The Securitizers agreed to purchase the loans and pool them with full knowledge of the contents of the loan files. The Servicers agreed to foreclose with full knowledge of the loan file for each loan.

379.     All of the conspirators continued to agree to the conspiracy over the course of tens of thousands of transactions.

380.     Defendants has acted as players in the conspiracy.

381.     Defendants have acted as Securitizers or the agents of securitizers in the conspiracy.

382.     For the purpose of forming and effectuating this conspiracy, Defendants and co-conspirators did the following things, among others:

383.     The "lender" with the knowledge of the servicer,  acting as Lender described above systematically and repeatedly violated state laws in order to originate mortgages, as described in the previous claims for relief;

384.     The unknown entity with the knowledge of the servicers and "lender" allowed their names to be designated as trustee for "lender" on the deed of trust for the Plaintiffs when the trustees knew that the "lender" was not loaning any money to the Plaintiffs.

106

385.    The Defendants acting as Securitizers knowingly and by agreement serviced the unlawfully obtained mortgage;

386.    The Defendants, acting as Lenders, Securitizers and Servicers utilized and benefited from the MERS system as a means of preventing detection by law enforcement or by the public and as a means of unlawful foreclosure to the detriment of homeowners;

387.    All Defendants named herein as co-conspirators profited from their respective roles in originating loans, selling them, and pooling their MERS registered home loans together in large bundles which were sold and turned into financial derivative instruments;

388.    The mortgage securitization process became known in financial industry parlance as "slicing and dicing." The slicing and dicing results in a pool of mortgages which have lost their individual characteristics but which have a high value to those who create them;

389.    The Defendants acting as Securitizers named herein obtained mortgages from the Defendants acting as Lenders named herein for securitization;

390.    The Defendants named as Securitizers herein sold the securitized and pooled mortgages as asset backed financial derivatives with affirmative claims that Defendants were unaware of any legal issues which would affect the value of the assets backing the securities, which was untrue, as Defendants actually knew that the mortgages were unlawfully obtained and subject to rescission, and knew that the mortgage and promissory notes had been split and, therefore, the note holders no longer had the right to foreclose, assuming that they ever did;

391.    The Defendants described herein as Servicers have and will attempt to unlawfully foreclose on the homeowner property. The Servicers will misrepresent the legal right to foreclose, when, in fact, they have no right to foreclose. The Servicers' foreclosure will illegally deprive the Plaintiffs of the legal title to their home if allowed to proceed;

392.    All Defendants named as MERS members agreed to promote MERS, an ostensibly lawful business, and to utilize MERS in an unlawful manner to deprive Plaintiffs and those similarly situated of property.

393.    The securitization process took distinct loans, deeds of trust, and mortgages, and pooled them together in such a manner that they lost their unique identity. Hundreds of such financial derivative instruments were created by the co-conspirators. The co-conspirators all profited from their respective roles in the process, including, but not limited to, the following pooling agreements.  These pooling agreements are examples of the type of pooling agreements utilized by the Defendants:

394.    Upon information and belief, Plaintiff's loan was securitized, "sliced and diced" and pooled into mortgage pools such as the ones described herein as part of the conspiracy related to the creation and operation of the MERS system, and Defendants, and each of them, profited from same and are liable for their acts and the acts of their co-conspirators in creating the MERS system, including, but not limited to, the use of MERS-approved and created documents to establish the loans (including, but not limited to, the form of deed of trust), and in participating in the securitization process described herein, thus, involving the Plaintiffs in this fraud upon the investors without their knowledge.

108

395.    Upon information and belief, Defendant conspirators utilized funds received as part of the Troubled Asset Relief Program payouts and payouts from the Federal Reserve or the FDIC to further the conspiracy to defraud Plaintiffs to deprive them of their money, to deprive them of their property and any equity in their properties, to unlawfully initiate foreclosure on their house and, by that foreclosure, ruin their credit and credit rating and standing in the community, to pay investors in the mortgage-backed securities which were comprised of the loan made to Plaintiffs and others similarly situated, and to pay bonuses to employees and officers of the Defendant conspirators based on their devising the subprime mortgage-backed products which were securitized by loans of the type issued to Plaintiffs, and collateralizing and selling such products in the United States and abroad.

396.    As a result of Defendant conspirators' conspiracy described herein, Plaintiffs have suffered injuries which include mental anguish, emotional distress, embarrassment, humiliation, loss of reputation and a decreased credit rating which has, or will, impair Plaintiff's ability to obtain credit at a more favorable rate than before the decrease in credit rating, the loss or anticipated loss of their Residence and other financial losses according to proof, and Plaintiffs have incurred attorneys' fees and costs in this matter.

397.    Defendant conspirators' actions were wanton, willful and reckless, and justify an award of punitive damages against Defendant conspirators, and each of them.

## COUNT IX.
### Conspiracy to Commit Wrongful Foreclosure by the Creation, Operation and Use of the MERS System

398.    Plaintiff incorporates by this reference each and every paragraph of this

Complaint as if set forth fully herein.

399.     Upon information and belief, Defendants and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in and benefit from wrongful foreclosures perpetrated on Plaintiffs as alleged herein, specifically in the First Claim for Relief, and the actions of the Defendant conspirators were taken as part of the business policies and practices of each Defendant conspirator in participating in the MERS system.

400.     The MERS system was known by Defendant conspirators as being used by the Defendant co-conspirators named in the first, second and third Claims for relief to facilitate the wrongful foreclosures complained of herein.

401.     Specifically, the MERS system was designed to remove the need for recordation of transfers of deeds of trust as alleged herein.  This component of the design of the MERS System facilitated the wrongful foreclosures complained of herein by making it easier to transfer

402.     Defendants for purposes of this as the "Defendant conspirators", and each of them, did knowingly and willfully conspire and agree among themselves to engage in a conspiracy to promote, encourage, facilitate and actively engage in and benefit from collecting mortgage payments and wrongful foreclosures perpetrated on Plaintiffs as alleged herein.  The actions of the Defendant conspirators were taken as part of the business policies and practices of each Defendant conspirator in participating in the MERS system.

403.     The MERS system was known by Defendant conspirators as being used

110

by the Defendant co-conspirators to facilitate a fraud on the public records and the wrongful foreclosures complained of herein.

404.     Specifically, the MERS system was designed to remove the need for recordation of transfers of deeds of trust as alleged herein.  This component of the design of the MERS System facilitated the illegal mortgage registration, transfer and wrongful foreclosures, by making it easier to transfer the purported beneficial interest in a mortgage and for the purpose of foreclosing on a property, despite the fact that the mortgage no longer provided security for a note as a result of the note having been separated from the deed of trust as alleged herein.

405.     The MERS system does not track the transfer of the notes nor to what entity the notes were transferred.

406.     The MERS system does not track the identity of the holders of the note on the Plaintiff's properties.

407.     Upon information and belief, the Defendant conspirators are or have been creators and/or directors of MERSCORP, Inc., MERS, Inc. and/or members of the MERS system, and, as to Defendant conspirators, and participated in the design and coordination of the MERS system described in this complaint.

408.     Yet to be named Defendants' participation as shareholders, directors, operators, or members of MERSCORP, Inc. and/or MERS, Inc. are as follows:

409.     MERSCORP, Inc. is the operating company that owns and operates the MERS System described herein, and is the parent company of Mortgage Electronic Registration Systems, Inc. ("MERS, Inc.").

410.    Defendants are members and/or shareholders of MERS or the agents of such.

411.    Whenever this Complaint refers to any corporation's act, deed, or transaction, it means that such corporation engaged in the act, deed, or transaction by or through its members, officers, directors, agents, employees, or other representatives while they actively were engaged in the creation, management, direction, control, or transaction of its business or affairs.

412.    The illegal use of the Mail, and the internet and which are specifically attributable to the Defendants subject to this Count, are:

413.    Bringing suit on behalf of entities which were not the real parties in interest, and which had no standing to sue. This involved, and involves, the use of the MERS artifice.

414.    Actively concealing the plaintiffs' lack of standing in their standard complaints for foreclosure, usually entitled, "Complaint to Foreclose Mortgage and to Enforce Lost

415.    Loan Documents." It is believed that in 80% or more of these mortgages held and foreclosure complaints filed by the Defendants, the original loan documents do not exist.

416.    Although MERS is the mortgagee of record, it has never been the "owner" or "holder" of the Note.   Most importantly, MERS is never the agent of the actual holder in due course or the owner of the Note.   MERS works for the servicing agent, which, as with MERS, is not the holder in due course or the owner of the Note. MERS never has a relationship with the owners of the Note.

417.    Alternatively, closed-ended continuity is present because the scheme occurred over a period in excess of ten years.

418.    As the result of the enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes and/or make a mortgage payment to a servicing entity not entitle to the proceeds of the Note.   All Class members, regardless of whether they are in foreclosure, have the title to their property clouded by the listing of MERS as mortgagee in the public record.

419.    The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members by foreclosing entity in the subject foreclosure Complaints.   Members not currently in foreclosure are entitled to damages in the amount of the MERS illegal publicly recorded mortgage.

420.    Since the real parties in interest are not parties to the foreclosures or Mortgagees of record, the mortgages were truly not subject to being foreclosed upon. 10

421.    The fair market value of the properties at the time of foreclosure is for this reason the measure of the damages suffered by the Class Members. The illustrive example is as follows:

422.    The average value of the properties was $250,000.00, and the Class is comprised of 10,000 persons.

423.    The initial damages to which the Class is entitled by law would be $2,500,000,000.00, or 2.5 billion dollars.

---

10 In most instances, the "real parties in interest" have already been paid, either by a CDS and/or through the T.A.R.P.; and the MBS "Fund" or "Trust" the Note was securitized for is no longer in existence.  Many of the MBS holding securitized collateral in Kentucky property, have been covered by Maiden Lane LLC, Maiden Lane II or Maiden Lane III; the corporation formed to pay off the debts of Bear Stearns.

424.     This amount is then tripled by operation of the Kentucky's conspiracy law.  Without reference to attorney fees and costs, the total damages awarded would be 7,500,000,000.00, or 7.5 billion dollars.

425.     The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived in the manner indicated in the preceding paragraph. plus costs and a reasonable attorneys' fee under 18 U.S.C. §1964[c],

**MERS/Merscorp, Inc.:**

426.     MERS/Merscorp, Inc. was created in or about 1998, and its purpose, from the outset, was to enact the fraudulent scheme enterprise herein complained.

427.     Its overt acts include the following:

a.   Creation of the MERS artifice;

b.   Planning, designing, and enacting the MERS criminal enterprise of which Plaintiff complains herein;

c.   Arranging for the use of the MERS as "mortgagee" in the standard mortgages at issue;

d.   Drafting of the standard MERS language to be included in such mortgages;

e.   Entering into one or more "agreements for signing authority" which purported to allow employees of Servicing Agents and foreclosure mill law firms to execute assignments in which the "assignor" and "assignee" are straw men actually not possessed of the capacity stated, and of which the person executing the document has no knowledge;

f.   Creation and maintenance of an acceptable public image for MERS;

114

g.   Owning and maintaining the registration and licensure of the MERS entity, Mortgage Electronic Registration Systems, Inc, with the necessary state agencies, plus other ministerial acts designed to maintain the corporate shield and to mimic the actions expected of normal corporations so as to fraudulently disguise its true nature;

h.   Facilitating the use of the MERS artifice by other participants in the scheme.

428.   These predicate acts are related. They share a common purpose, defrauding the Class Members and other borrowers of their money and property. They share the common themes of "non-documentation" and concealment of the real parties in interest.

429.   The predicate acts satisfy the continuity requirement: they extend from in or about 1998 through and continue unabated at the present time, which meets the definition of "open-ended" continuity. In the alternative, the participants in the RICO enterprise engaged in a pattern of racketeering activities continuously for a period of time exceeding ten years in duration, which as a matter of law suffices to establish "closed-ended" continuity.

430.   As the result of the enterprise of which these actions were part, the Class Members have suffered damages, in that they have lost their homes. The measure of the damages for the Class Members is the average of the accelerated amounts demanded from the Class Members by the Defendant Firm in the subject complaints "to Foreclose Mortgage and to Enforce Lost Loan Documents." Since the real parties in interest had already been paid, the mortgages were truly not subject to being foreclosed upon, and the fair market value of the properties for this reason is the measure of the

damages suffered by the Class Members. The manner in which damages should be calculated is set forth herein.

431.     The Class Members are entitled to judgment in the amount of three times their actual damages, which should be arrived at using the formula set forth in said paragraph, plus costs and a reasonable attorneys' fee under Kentucky law.

## Count X.
## Violations of the Kentucky Residential Mortgage Fraud Act KRS 286.8-990

432.     Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

433.     KRS 286.8-990 states that ANY of the actions as set out in the statute constitute a violation of the Act:

A person is guilty of residential mortgage fraud when, with the intent to defraud, that person does any of the following in connection with the mortgage lending process:

434.     The original Lender, the MBS originators, servicers/trustees and MERS conspired together and acted in concert under the facts as previously set out in both the fraudulent inducement of the original transaction. Their fraudulent attempt to enforce such is an act of fraud and a violation of the Act as to sections (2)(a-h).

## COUNT XI.
## Unjust Enrichment

435.     Plaintiffs incorporate each and every paragraph of this Complaint as if fully set forth in this claim.

436.     Defendants' deceptive scheme as alleged herein will unjustly enrich Defendants, and each of them, to the detriment of Plaintiffs, by causing Defendants, and each of them, to receive monetary payments from the mortgage payments, and/or the sale

116

of Plaintiffs' properties through illegal foreclosures.   The Defendants were not entitled to the mortgage payments or proceeds of a foreclosure.   The Defendants did not fund the loans of the Plaintiffs.

437.   Specifically, Plaintiffs have been injured in their property and will lose their cash and personal investment in the home and right to peaceful enjoyment of their home in a variety of ways, including but not limited to:  All borrowers who were targeted for and lured into the mortgages sold by Defendants were kept from knowing the true purpose of the securitization and the use of the funds of the investors.  This constituted a misrepresentation that caused Plaintiffs to make their monthly payments of what represented the equity in their homes to the Defendants and their Servicers.   The result is that the Plaintiffs assumed financial burdens that they would not otherwise had assumed, and paid Defendants funds to which the Defendants were not entitled or owed.

438.   The loans made to Plaintiffs were then repackaged, reassigned, and/or resold, each with a margin of profit for the assignee/buyer that would not otherwise have existed had Plaintiffs not been deceived by the original terms of the loans and/or the lack of disclosures as alleged herein, along with all the similarly situated loans going on at the same time and in the same manner.   Likewise, Plaintiffs would not have continued to make payments on the loans if the Defendants had properly disclosed the discharge in whole or in part of the obligations on the notes to the investors or that those obligations would be discharged by other means upon foreclosure and that the servicers would be given the houses without having invest any money into the loans to the Plaintiffs. Likewise the Plaintiffs would have continued to make some payments on their loans had the Defendant Servicers not instructed them to stop making payments in order to seek

modifications of their loans.

439.    Plaintiffs have paid inflated interest rates that, upon information and belief, would not have been agreed to but for the failure to understand the documents and otherwise disclose the true terms and costs of the loans, tangential services, and out-of-pocket costs and that the housing market would not, as represented by the Defendants and their agents, the "lenders" continue to increase in value but would, because of the acts of the Defendants, crash and cause catastrophic loss of value in the real estate market.

440.    Upon information and belief, Defendants, and each of them, retained and continue to retain these ongoing and escalating profits to the detriment of Plaintiffs, contrary to the fundamental principals of fairness, justice, and good conscience and reasonable business practices.

441.    Upon information and belief, all payments made to the Defendants servicing the Plaintiff's mortgages or holding the Plaintiff's home are not due to the Defendants who are making demands for collection.

442.    The Defendants who have serviced the loans and now hold the home of the Plaintiffs did not fund the loans, did not loan any money to the Plaintiffs, and are not the holders in due course of the notes of the Plaintiffs and have no lawful right to foreclose upon Plaintiff's houses.

443.    Upon information and belief, all sums advanced to Plaintiffs for loans by investors has been repaid, settled, satisfied or otherwise are no longer outstanding.

444.    Accordingly, Defendants, and each of them, should be ordered to return all funds obtained as a result of their deceptive scheme on Plaintiff.

445.     MERS, an entity not licensed to engage in the practice of mortgage lending, committed forgery as to both subsections (1)(a) and (1)(b) when it placed a Mortgage into the records of the County clerk for which it had no pecuniary right rights or interest in the Mortgage Note.

446.     The Plaintiff and Lerner Sampson & Rothfuss violated both sections of the act   when Lerner drafted and  forged a Post-Foreclosure Mortgage Assignment on behalf of both MERS and the original Lender.

## COUNT XII.
### KRS 516.030 Kentucky Forgery in the Second Degree

447.     Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

448.     A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument which is or purports to be or which is calculated to become or to represent when completed:
(a) A deed, will, codicil, contract, assignment, commercial instrument, credit card or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status; or
(b) A public record or an instrument filed or required or authorized by law to be filed in or with a public office or public employee; or
(2) Forgery in the second degree is a Class D felony.

449.     The forgery on the Assignment was an "Unauthorized Signature" under Kentucky's Uniform Commercial Code, meaning "a signature made without actual, implied, or apparent authority." KRS 355.1-201(2)(ao).    Nor is the Assignment "Genuine" meaning "free of forgery or counterfeiting."   KRS 355.1-201(2)(s).   The Assignment is null and void.  It is unenforceable.

450.     The acts of the Defendants in forging the mortgage assignments and the subsequent filing of such with the County Clerks across Kentucky violates both sections (1)(a) and (1)(b.)  Each mortgage assignment executed and filed since 2007 constitutes a

119

separate violation of the act and a separate Class D felony, illustrating a systematic pattern and partnership.

**COUNT XIII.**
**KRS 516.060 Criminal Possession of a Forged Instrument**

451.  Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

(1) A person is guilty of criminal possession of a forged instrument in the second degree when, with knowledge that it is forged and with intent to defraud, deceive or injure another, he utters or possesses any forged instrument of a kind specified in KRS 516.030.
(2) Criminal possession of a forged instrument in the second degree is a Class D felony.

452.  Each mortgage assignment executed and filed constitutes a separate violation of the act and a separate Class D felony, illustrating a systematic pattern and partnership.

453.  The Defendants worked together to create the forge Mortgage Assignments.  Therefore knowledge of the forgery is irrefutable.  The Defendants both possessed and uttered the forgeries in to the land records across Kentucky.  All parties taking part in or who conspired with those who participated in the acts or practices in question are jointly and severally liable to the Class Members.

**COUNT XIV.**
**KRS 378.010 and 378.030 Fraudulent Conveyance**

454.  Plaintiff incorporates by this reference each and every paragraph of this Complaint as if set forth fully herein.

455.  KRS 378.010 Fraudulent conveyances and encumbrances -- Void as to whom -- Exception.:

Every gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal, or right or thing in action, or any rent or profit thereof, made with the intent to delay, hinder or defraud creditors, purchasers or other persons, and every bond or other

120

evidence of debt given, action commenced or judgment suffered, with like intent, shall be void as against such creditors, purchasers and other persons. This section shall not affect the title of a purchaser for a valuable consideration, unless it appears that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor.

456.     KRS 378.030 Action on fraudulent conveyance or encumbrance of real property -- Proceedings.

Any party aggrieved by the fraudulent conveyance, transfer or mortgage of real property may file a petition in equity against the parties thereto or their representatives or heirs, alleging the facts showing his right of action, alleging the fraud or the facts constituting it and describing the property. When this petition is filed a lis pendens shall be created upon the property described, and the suit shall progress and be determined as other suits in equity and as though it had been brought on a return of nulla bona.

457.     The parties are aggrieved by the transfer of mortgage of their real property.   This action serves as a Petition in Equity against the Defendants.   A lis pendens "suit pending" and notice to the world is now created upon the parties' property and a lis pendens shall exist on each and every piece of Kentucky property owned by the members of this Class Action.

458.     All parties taking part in or who conspired with those who participated in the acts or practices in question are jointly and severally liable to the Class Members.

## VIII.   CONCLUSION

459.     Upon information and belief, the Defendants, did not and cannot legally obtain foreclosures and/or file an Assignment of the Notes or Mortgages of the representative Plaintiffs or the putative Class Members.   Neither the Defendants or MERS had capacity or standing to file suit or foreclose on property.   In conspiracy with each other, the Defendants, filed fraudulent mortgages, affidavits, and mortgage assignments,  filed sham pleadings and committed and continue to commit fraud on the recording clerks and the Courts.

460.    These violations as aforementioned entitle the Plaintiffs and putative Class members to recover the actual damages they have sustained as a result of the improper filing of foreclosure suits and the improper filing of the Mortgage Assignments; statutory damages as permitted by law; restitution under for the violations of the criminal acts, treble damages as allowed by the acts, punitive damages, and cost and attorneys fees incurred.  The Plaintiffs are entitled to equitable relief as to the clearing and quieting of the title to their properties in relation to the filing of false Note and Mortgage Assignments.

461.    MERS should be enjoined from this day forward from drafting, executing and filing Mortgages and Mortgage Assignments and should be further enjoined from filing Complaints in Foreclosure based in fraud and further be enjoined from prosecuting all pending cases.

## IX.  JURY TRIAL AND DEMAND FOR RELIEF

WHEREFORE, the Plaintiffs on their own behalf and on behalf of the putative Class Members, request the this Court enter judgment against the Defendants jointly and severally and award all damages, costs and any other  relief the Court deems proper on behalf of the Class Members, demands judgment against the Defendants, jointly and severally, for the total damages sustained by the Class, plus costs, attorneys' fees, and such additional relief as the Court or jury may deem just and proper, including imposition of liability on the members of the conspiracy not presently named as Defendants in this action. as follows:

1. Certification of the action or common issues herein as a Class Action, and the designation of any sub-classes, for any and all claims and issues, under the applicable

class action provisions and appointment of counsel of record as the appointed class counsel for any and all proceedings relating to this action.

2. Such coordination and cooperation as may be appropriate between this Court and other Courts that may exercise subject matter jurisdiction over the subject of this litigation, but with other Class Actions filed against other Defendants.

3. A determination of common issues and claims in unitary consolidated Class Action

4. An award of actual and compensatory damages, statutory damages as permitted by law; restitution under for the violations of the criminal acts, treble damages as allowed by the acts, punitive damages, and cost and attorneys fees incurred and equitable relief as to the clearing and quieting of the title to their properties in relation to the filing of false Note and Mortgage Assignments.

5. An Injunction halting from this day forward, the filing of new foreclosure or Declaratory Judgments, or the prosecution of existing law suits, and an Order which punishes severely and sanctions any violation of said Injunction by any of the Defendants.

6. A trial by jury.

7. Any other relief legal and/or equitable to which the Plaintiffs and the putative Class Members are entitled at law or for which the Court deems proper, including, according to proof, exemplary or punitive damages as may be necessary and appropriate to punish the past and present and deter future reprehensible misconduct.

Dated September 28, 2010

Most respectfully submitted,

/s/ Heather Boone McKeever

Heather Boone McKeever
McKEEVER LAW OFFICES PLLC
3250 Delong Road
Lexington, Kentucky 40515
Tel:  859-552-7388
Fax:  859-327-3277
kentuckyforeclosuredefense@insightbb.com
ATTORNEY FOR CLASS PLAINTIFFS AND
THE MEMBERS OF THE PUTATIVE CLASS